# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 97-DP-00763-SCT

*LINNOX MARCUS WALKER*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/1997 |
| TRIAL JUDGE: | HON. R. KENNETH COLEMAN |
| COURT FROM WHICH APPEALED: | MARSHALL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DAVID L. WALKER |
| | JOHN D. WATSON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LESLIE S. LEE |
| DISTRICT ATTORNEY: | JAMES M. HOOD, JR. |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | REVERSED AND REMANDED - 5/27/1999 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BANKS, JUSTICE, FOR THE COURT:**

¶1. Appellant Linnox Walker has appealed his conviction of capital murder and sentence to death. We affirm the conviction, remanding for the limited purposes of conducting a hearing as mandated in ***Batson v. Kentucky*, 476 U.S. 79 (1986)**. We reverse as to sentencing and remand for a new sentencing hearing.

## **I**.

¶2. On May 11, 1994, Linnox Walker and Mario Jeffries, both residents of Marshall County, Mississippi went riding to Oxford, Mississippi to visit friends. On the way to Oxford, they stopped in Abbeville, Mississippi, at their friend Regina Wiley's house for a short visit from around 8:30 p.m. until 9:00 p.m. Around 12:15 a.m., Walker and Jeffries left Oxford because they wanted to buy cold beer, which is not lawfully sold in Oxford.

¶3. They drove back toward Waterford, Mississippi, in Marshall County to purchase the beer from a store run by Bobby Dean Henderson. Jeffries told Walker he did not have any money to buy beer, to which Walker responded that he "was going to rob it." Jeffries then informed Walker that Henderson would probably kill him because he always wore a pistol. Walker responded that he would "get him first". No

other people or cars were around when they arrived at the store. Walker told Jeffries to "come on in", but Jeffries refused. Jeffries told Walker not to "do it", but was scared to grab him because Walker then had a pistol in his possession. Jeffries saw Walker get the gun as he was getting out of the car and place it inside his belt.

¶4. Walker went in the store, but Jeffries could not see inside the store because the store windows were tinted. After Walker went in, Jeffries heard a gunshot. Immediately after Jeffries heard the gunshot, he observed Walker exiting the store with a cash drawer and a pistol. Walker threw the cash drawer and the .357 pistol into the car though Jeffries' window on the passenger side, which was down. Jeffries believed this gun to be that of Bobby Dean Henderson, which he had seen on various trips to the store. Walker went back into the store for a few seconds before getting in the car with the same gun in his hand that Jeffries saw when Walker first got out of the car and went into the store. Walker, who did not come out of the store with any beer, pulled off. As they were leaving the store, Jeffries asked Walker did he kill Henderson. Walker replied, "What do you think?"

¶5. Around 1:00 a.m, the body of Bobby Dean Henderson was found by Danny Thomas, who had stopped by the store to speak with Henderson on his way from Oxford. Thomas, who immediately called 911, saw nothing unusual on his way to the store.

¶6. Walker and Jeffries returned to Regina Wiley's home in Abbeville. Upon arriving at Wiley's home, Jeffries went in and told her what happened. Walker came into the house about five minutes later. Jeffries did not call the police at that time because Wiley did not have a telephone. He did not try to find a phone because he felt that Walker would wonder what he needed to use the phone for. Jeffries went in the bedroom to go to sleep, while Walker stayed in the living room.

¶7. When Jeffries awoke the next morning, he noticed Walker sitting in the floor of the living room counting out money. He also noticed that Walker had both guns and the cash drawer with him in the house. Walker told him there was $1,700 in the cash drawer. Both men then left to go back to Waterford, where Jeffries lived with his parents. On the way there, they pulled off on a dirt road, and Jeffries threw the cash drawer down a hill by the road, into a gully-like area. The pistol was not thrown away. Walker then dropped Jeffries off at his parent's home between 10:00 and 11:00 a.m. Before Jeffries exited the car, Walker told Jeffries not to tell anybody what happened. Jeffries interpreted that to mean that if he did tell anybody, Walker would kill him. Nevertheless, later that evening, Jeffries told his brother, Toracco Jeffries, about what happened at the store.

¶8. Jeffries next saw Walker at a crap game in Holly Springs a couple of days later, but nothing was said about the events that occurred on May 11, 1994. Jeffries did later see Walker target practicing with the pistol that was taken from the store, but never saw the gun after that. About a week after this incident, Jeffries was approached by Anthony Gardner, who informed Jeffries that Walker told him what happened at the store.

¶9. On the Friday after the murder, Gardner was riding around with Walker, and Walker told Gardner how he had robbed the store and shot Bobby Dean Henderson. About a week later, Gardner asked Jeffries about the events that occurred in the early morning hours of May 12, 1994, and Jeffries confirmed what Walker had told Gardner. In June of 1996, Gardner gave a statement to Marshall County Sheriff Kenneth Dickerson implicating Walker and Jeffries in the robbery of the store and shooting. Based on information obtained in investigation and Gardner's statement, Walker and Jeffries were arrested. Both were indicted

for capital murder. Jeffries pled guilty a reduced charge of manslaughter. Walker denied any knowledge of or involvement in the crime.

¶10. At trial, Jeffries also testified that he did not flee when Walker pulled up to the store because he did not believe Walker was actually going to rob the store. According to Jeffries, Walker did not have on any kind of mask or gloves. Walker also gave Jeffries $100 on the Saturday after the robbery, which Jeffries claimed Walker owed him. In his statement to Sheriff Dickerson, Jeffries said Walker was supposed to give him $100 of the store money, and that when Walker came out of the store, he claimed, "the dude made a move on him".

¶11. Anthony Gardner testified for the State. Gardner has known Walker for approximately five or six years, and testified that he considered both Jeffries and Walker to be his friends. Gardner admitted that he gave conflicting statements to Sheriff Dickerson because he was scared, but that the statements given were substantially the same. At trial, Gardner testified that Walker confided in him that he "went into the store to get a twelve-pack of beer, put it on the counter, went back out, played like he didn't have enough money, went back in the store, shot him." Gardner further testified that he had no involvement in the robbery of the store or the shooting of Bobby Dean Henderson and that he only knew what Walker had told him.

¶12. The State's case-in-chief included the testimony of Sheriff Dickerson. During the late hours of May 11, 1994, Dickerson, then a Highway Patrol Officer, was called by the Marshall County Sheriff's Department to assist in an investigation of a homicide at the Speed Shop. Inside the store, Dickerson observed the body of Bobby Dean Henderson behind the store's counter and noticed the cash drawer was missing. Already in the store were Deputies David Pannell and Robert Burke; Chuck Thomas, the county medical examiner; and several officers with the Marshall County Sheriff's Department.

¶13. Dickerson proceeded to investigate the crime scene, which included the taking of photographs. These photographs, which were received into evidence at trial, depicted the inside of the store; the counter and the cash register with the missing cash drawer; two weapons found near the body; a twelve-pack of beer that was on the counter upon arrival of the Dickerson; an enlarged photo that shows Henderson's body lying in the floor; the outside of the store, and the position and location of Henderson's body. Based on the location of the body and blood splattered on the bottom portion of a broom found near the body, the Sheriff Dickerson suggested that the Henderson would have been in a kneeling position at the time he was shot. At this point, the defense objected, arguing that Dickerson was not qualified to state such an opinion. The trial judge allowed Dickerson's statements to stand. There were also photographs depicting the blood-splattered broom. The defense made a motion in limine to exclude the photographs of the body, arguing they were highly prejudicial and cumulative. All except one were introduced into evidence.

¶14. No identifiable finger prints were removed from the twelve pack, and no fingerprints were taken from the scene.

¶15. The State presented the testimony of Dr. Stephen Hayne as an expert witness in the field of forensic pathology. Dr. Hayne, who examined the body of Bobby Dean Henderson on May 12, 1994, opined that Henderson died from a gunshot wound to the forehead that was near contact and penetrating, meaning the gun was fired at close range with the bullet entering but not exiting the body. His external examination revealed a large abrasion ring ( a scraping of the skin ) around the gunshot wound, with tattooing located around the entrance gunshot wound as well. The doctor also found that the bullet entered Henderson's body at a forty-five degree angle. Entrance at such an angle would indicate that the shooter was above

Henderson, who would have been in a lower position when he was shot.

¶16. Cooper Epps testified for the State that he met Walker around June of 1996 while they were cell-mates at the Benton County Jail. He said that Walker confided that he had shot a white man in the head at close range and that the murder weapon would never be found. Epps conveyed this information to Sheriff Dickerson. Epps did not know Walker before they were incarcerated together and had not heard about the robbery or murder before.

¶17. The State rested following Epps' testimony. Walker then presented the testimony of Alan Thompson, Master Sergeant with the Mississippi Highway Patrol Criminal Investigation Bureau. Thompson assisted in the investigation of Linnox Walker. Thompson found no physical evidence connecting Walker to the death of Henderson.

¶18. Linnox Walker was called next as a witness. Walker denied killing or knowing Bobby Dean Henderson. He also denied involvement in the robbery. Walker admitted knowing Cooper Epps, but claimed he did not tell Epps that he had shot Henderson.

¶19. After calling Jeffries to state that he could not remember what Walker was wearing on the night of May 11, 1994, the defense rested. The jury found Walker guilty of capital murder. The following day, the jury heard evidence in the sentencing phase. Walker was sentenced to death by lethal injection.

¶20. Walker's post-trial motions were denied, and he appeals to this Court for relief.

## II.

¶21. Walker alleges a violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986), by the State's use of seven out of its nine peremptory challenges against black jurors. Walker invoked *Batson* and asked the court to require the State to present race-neutral reasons for its peremptory challenges. The trial judge ruled that there was no systematic exclusion of black jurors evidencing racial discrimination by the State, and did not require the State to present race-neutral reasons for its peremptory challenges. The State asserts that Walker failed to make out a prima facie case of discrimination in the exercise of the strikes.

¶22. To establish a prima facie case of purposeful racial discrimination in the exercise of peremptory challenges, a defendant must show: (1) that he is a member of a cognizable racial group; (2) that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race; (3) and that the facts and circumstances raised an inference that the prosecutor used his peremptory challenges for the purpose of striking minorities. *Batson v. Kentucky*, 476 U.S. 79, 80, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986). *See also* *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987). Once the prima facie case has been made, the prosecution must supply race-neutral reasons for using peremptory challenges on minority members. *Bush v. State*, 585 So. 2d 1262, 1268 (Miss. 1991) (citing *Batson,* 476 U.S. at 98, 106 S.Ct. at 1724). The prosecution's explanation need not rise to the level required for challenges for cause. *Batson*, 476 U.S. at 97. Instead, a neutral explanation related to the particular case to be tried must be articulated by the prosecutor, after which the trial court has the duty to determine if the defendant has established purposeful discrimination. *Id*. Finally, the trial court must determine whether the defendant has proved purposeful discrimination. *Bush*, 585 So. 2d at 1268.

¶23. Here, the State used seven out of nine peremptory challenges to exclude black persons. The final jury

resulted in ten whites and two blacks, although the population of Marshall County is 50% black. Walker has shown that he is a black person and that the State exercised peremptory challenges to remove black persons from the jury. The court's ruling that there was no prima facie case of discrimination was based on the State's seating of two blacks on the jury, notwithstanding the fact that the population of Marshall County is 50% black. The trial court reasoned that if the State's purpose was to excuse based on race, it could have used all twelve strikes against blacks. This Court, however, held in *Conerly v. State*, 544 So. 2d 1370, 1372 (Miss. 1989), that the mere acceptance of other black persons as jurors is no defense to a *Batson* claim. *Id.*

¶24. We conclude that an inference of racial discrimination was presented by Walker and that the lower court erred in failing to conduct a *Batson* hearing. Accordingly, this case is remanded to the circuit court for a *Batson* hearing pursuant to *Thorson v. State*, 653 So. 2d 876 (Miss. 1994), to determine whether *Batson* was violated. *See also* *Kolberg v. State*, 704 So. 2d 1307, 1313 (Miss. 1997). Following *Thorson*, the State will be given an opportunity to present race neutral reasons for each of the challenges used against blacks and Walker may rebut the State's explanations. *Thorson,* 653 So. 2d at 896. If the trial court finds purposeful discrimination, it should order a new trial. If there is no evidence of discrimination, however, the circuit should by opinion and order make its factual findings and certify the same to this Court. *Id.*

### III.

¶25. Walker argues that his motion to exclude photographs should have been granted because these photographs were cumulative, enlarged, gruesome and inflammatory, thus lacking in probative value.

¶26. This Court has repeatedly held that the admissibility of photographs is within the sound discretion of the trial judge. *Brown v. State*, 690 So. 2d 276, 288 (Miss. 1996); *Jackson v. State*, 684 So. 2d 1213, 1230 (Miss. 1996); *Mackbee v. State*, 575 So. 2d 16, 31 (Miss. 1990). The decision of the trial judge will be upheld unless there has been an abuse of discretion. *Brown,* 690 So. 2d at 288. However, autopsy photographs are admissible only if they possess probative value. *Jackson*, 672 So. 2d at 1230. If photographs are relevant, the mere fact that they are gruesome or unpleasant is no bar to their admission into evidence. *Sudduth v. State*, 562 So. 2d 67, 69 (Miss. 1990) (*citing Davis v. State*, 551 So. 2d 165, 173 (Miss. 1989).

¶27. The photographs in question depict Henderson lying face down on the floor in a pool of blood; the physical location where the body was found, which include a blood-splattered broom found near Henderson's body; and the front entrance of the store, with Henderson's body behind the counter. Walker also argues against the admission of an enlarged photograph of Henderson's gunshot wound.

¶28. As the photographs were presented by the State, the court allowed them to be introduced into evidence only after the State made showings as to the probative value of each picture. As to the enlarged photo of Henderson's head depicting the gunshot wound and tattooing around the wound, the court did not consider the picture gruesome, but probative to the testimony of Dr. Hayne. The trial judge did not abuse his discretion by admitting the photographs. The probative value of the pictures was not outweighed by prejudicial effect, nor were the photographs cumulative. This assignment fails.

### IV.

¶29. Walker asserts that the trial court erred in overruling his objections to the testimony of Sheriff Dickerson that Henderson was on his knees or kneeling when he was shot. He argues that Dickerson was testifying as an expert witness without being first qualified as such. Walker contends Dickerson's testimony was a discovery violation because he was not disclosed as an expert before trial. However, Walker's objection at trial was not grounded on a discovery violation, rather it was raised on the ground that Dickerson was not qualified to give an expert opinion. The State argues that Dickerson's testimony was lay opinion testimony that was properly admitted.

¶30. Dickerson was presented with a photograph during his testimony. The testimony Walker objected to is as follows:

Q: Sheriff, can you tell the ladies and gentlemen of the jury what that depicts?

A: Yes, sir. This depicts the physical location where the body was found. Upon my arrival , I observed the broom at the bottom portion. The broom that 's depicted in this photograph has blood splattered on it, *indicating to me the person would have been in a kneeling position at the time he was shot and not in a standing position.*

Mr. Walker: I would object, Your Honor. I don't think the Sheriff is qualified to state that opinion. The Sheriff is a former Highway Patrol Investigator. He's not any kind of physicist. He's not a medical doctor, and therefore, he's not qualified to comment on that issue.

THE COURT: He's answered. I am going to let it stand. Go ahead.

¶31. Dickerson's later testimony during the State's direct examination was that the bulk of the blood was on the floor, around the broom. Dickerson observed that the main portion of the blood that was found near the body is depicted in the photographs he took as being in the lower area of the surroundings. Walker objected after the State posed the following question to Dickerson:

Q: Did you make any determination as to what that indicated as to the location of the blood you found in the those photographs?

MR. WALKER: I object, Your Honor. I don't think this witness is qualified to testify.

THE COURT: He can testify what he saw and observed. All right ask him what he--

MR. WALKER: But I object to him rendering that opinion, Your Honor.

THE COURT: All right, sir. Let's see where we're going. Ask him what he saw and observed.

Q: Just describe for the ladies and gentlemen of the jury, rather than the photographs, just tell us where the blood was located.

A: What I observed was the main portion and the blood--bulk of the blood splattered was located on the floor and lower part of the area next to the body, which common sense would tell you, and you don't have to be an expert to state this, if a person had been standing up and had been shot standing up--

MR. WALKER: I object. I object, Judge. I object Your Honor. That's rendering his opinion, and

he's not an expert on that subject. He's not a physicist, a doctor or anything like that.

THE COURT: I think the Sheriff covered that very adequately. Let's move on.

¶32. Rule 702 of the Mississippi Rules of Evidence provides that "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or other wise." M.R.E. Rule 702. This Court has held that where, in order to express opinion, a witness must possess some experience or expertise beyond that of an average, randomly selected adult, the opinion is expert opinion rather than lay opinion. *Cotton v. State,* 675 So. 2d 308, 311 (1996); *Langston v. Kidder,* 670 So. 2d 1, 3 (Miss. 1995) (citing *Mississippi State Highway Comm'n v. Gilich*, 609 So. 2d 367, 377 (Miss. 1992).

¶33. To give expert testimony, the witness must be qualified and tendered as an expert. *Roberson v. State*, 569 So. 2d 691, 696 (Miss. 1990). If the expert witness has not been first tendered as an expert, the expert opinion should not be allowed. *Sample v. State*, 643 So. 2d 524, 529 (Miss. 1994). If the witness is not testifying as an expert, his testimony in the form of opinion and inference is limited to those opinions which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue. *Sample v. State,* 643 So. 2d at 529.

¶34. Here, the State did not present Dickerson as an expert witness, but his testimony was so specialized as to amount to an expert opinion. His testimony that Henderson was in a lower position when he was shot was a conclusion drawn by Dickerson as to why the main portion of blood was located in the lower areas around Henderson's body. Even if Sheriff's Dickerson's testimony were lay opinion as the State argues, not all lay opinions are admissible. For lay opinion testimony to be admissible, it must be helpful to the jury. *Id*. The sheriff's testimony that Henderson was kneeling or in a lower position than the shooter, based on the location of the blood splatters, is not something that a lay person would know, but rather, it came about by special knowledge. But, assuming arguendo, that it is a conclusion that a lay person could draw from the facts, it is not helpful to the jury because lay jurors could draw the same conclusion. The fact that Sheriff Dickerson had no education is irrelevant to the fact of whether he can be considered an expert. Formal education is but one route to expertise. *See Harris v. Shields*, 568 So. 2d 269, 271 (Miss. 1990). Dickerson testified that he had worked fifteen years in the criminal investigative division, assisting in numerous crime scene investigations. In over 100 of these investigations, Dickerson took photographs depicting a deceased victim, just as he did in this case. The State could have qualified him as an expert witness and tendered him as such. The State failed to do so, however, and the admission of the opinion was, therefore, error.

¶35. The error was, in the end, harmless because there was other testimony to the same effect. Immediately before Dickerson's testimony, Dr. Hayne, the State's expert witness, testified that based on the probable 45 degree angle of the bullet, his conclusion was that Henderson was in a lower position than the shooter when he was shot . In addition, Cooper Epps testified that Walker confided in him that he shot a white man in the head during a store robbery while the man was on his knees.

¶36. Walker now argues in his brief to this Court that the State committed a discovery violation by failing to disclose Dickerson to him before trial as an expert witness. However, Walker failed to raise this as a ground for objection at trial. Walker's objection at trial was that Dickerson was not qualified to testify as an expert witness. This Court has repeatedly held that a contemporaneous objection is necessary to preserve

an issue for appeal. *Mackbee v. State*, 575 So. 2d 16, 30 (Miss. 1990). Because Walker failed to object to such a discovery violation, this issue is waived.

<h1 style="text-align:center">V.</h1>

¶37. In his next assignment of error, Walker claims the trial court should have granted his objection to the testimony of Cooper Epps concerning Walker's marking of gang signs on the walls of his cell.

¶38. Walker, in the sentencing phase of the trial, made a motion in limine to exclude the testimony by Epps that Walker had marked gang signs on the wall of the cell they shared. The State contended this testimony was relevant to show Walker's ability to carry out threats to Mario Jeffries that Walker's fellow gang members would "get" him, as well as his continuing attempt to avoid prosecution and arrest. On cross-examination during the guilt phase of the trial, Walker denied any gang activity and denied scribbling any gang signs on the cell wall. Walker argues this testimony is not relevant during the sentencing phase of the trial, and, therefore, should not have been admitted because it subjected him to evidence of other crimes and involvement in other crimes.

¶39. The question of Walker's involvement in a gang first arose during the guilt phase of the trial. On direct examination, Walker was asked whether he had ever threatened to kill Anthony Gardner or Mario Jeffries. Walker denied ever making any threats. On cross examination, Walker was questioned extensively about gang signs and threats as follows:

Q: And you testified that you hadn't made any threats against anybody in this case.

A: No, sir. I never made any threats.

Q: You didn't tell Mario not to tell anybody about this crime?

A: No, sir. I never knew Mario was even involved in this crime until, you know, I was brought to jail.

Q: You didn't tell Anthony Gardner not to say anything about this crime?

A: I am saying the same goes with Anthony Gardner.

Q: Isn't it true within the last month down at the jail that you threatened Toracco Jeffries?

A: Toracco Jeffries?

Q: Yes.

A: I haven't seen Toracco Jeffries except for outside the visiting gates. The other inmates, you know, they holler, you know, a lot of stuff out like, you know, Linnox Walker didn't do this, and y'all ought to stop all this and all that stuff. They the one - the other inmates are the ones that talking bad to him. I haven't told no inmate anything to make no threats at all.

Q: Isn't it true that you told Mario Jeffries that you were going to get your fellow gang members to get him when he got to Parchman?

A: No, sir. I'm not in a gang.

Q: You denying being in a gang?

A: Yes, sir.

Q: Didn't you scribble signs in Cooper Epps cell, gang sings?

A: No, sir.

Q: Didn't you tell Toracco Jeffries that if you got time on this case, there was going to be a lot of drive-bys; is that what you said?

A: No, sir. I never told Toracco Jeffries anything as such.

¶40. No rebuttal testimony was offered to show that Walker had made such threats or that he was a member of a gang until the sentencing phase of the trial. The State also failed to show the relevancy of such questioning.

¶41. While Walker did not object to the cross-examination, he did object to Epps' testimony during the sentencing phase, and the total failure of the State to produce evidence in support of its claims concerning threats and gang affiliation is relevant to our mandatory consideration of whether the death penalty was based upon an arbitrary factor. *See* Miss. Code Ann. § 99-19-105(3)(c)(Supp. 1998).

¶42. The asking of questions without a factual basis leaves an impression in the mind of jurors that the prosecutor actually had such facts in hand and that the insinuations through questioning contained some truth. This leaves false and inadmissible ideas in the minds of jurors that cannot be adequately rebutted by the testimony of witnesses or instructions from the court. *See* Bennett L. Gershman, ***Prosecutorial Misconduct*** § 9.4(a), p.9-23 (1989). In ***United States v. Silverstein***, 737 F. 2d 864, 867-868 (10th Cir. 1984), cited by Gershman, the prosecutor on cross examination asked the defendant if he knew a certain inmate, to which the defendant responded no. The prosecutor went on to ask about alleged conversations between the defendant and the inmate, and the inmate continuously denied knowledge of the statements or the person. ***United States v. Silverstein***, 737 F.2d at 867-68. The prosecutor never called that inmate as witness. The trial court was found in error for permitting the prosecutor to ask the defendant the questions when the prosecutor knew he could not prove by any evidence the substance of the alleged conversation. *Id*. The court of appeals held that a prosecutor who asks the accused a question that implies the existence of a prejudicial fact must be prepared to prove that fact. ***Id.***

¶43. We have also considered the issue of prosecutors questioning witnesses with no evidentiary basis for the questioning. In ***Hosford v. State***, 525 So. 2d 789, 793 (Miss. 1998), this Court held that it is error for the prosecutor to accuse or insinuate that the accused is guilty of other crimes for which he denies, and then makes no attempt to prove them. ***Hosford v. State***, 525 So. 2d at 793. In ***Hosford***, which dealt with other crimes evidence, the Court noted that it is prejudicial error for questions on cross-examination to contain insinuations and intimations of such conduct when there is no basis in fact. *Id*. Such questioning without evidentiary basis has been found by this Court to be inflammatory and extremely prejudicial. *Id*. In ***Scott v. State***, 446 So. 2d 580, 584 (Miss. 1984), the prosecutor during cross-examination of a witness continuously insinuated that the witness had made certain statements in grand jury testimony with no evidence to establish that any statements had in fact been made. This Court found such action by the prosecutor to be prejudicial to the defendant. *Id*.

¶44. When faced with this question now before the Court, the Arizona Court of Appeals found that to ask a question which implies the existence of a prejudicial factual predicate which the examiner cannot support by evidence is unprofessional conduct and should not be condoned. *State v. Ballantyne*, 623 P.2d 857, 860 (Ariz. Ct. App. 1981). In *Ballantyne*, the prosecutor on cross-examination questioned the defendant's affiliation with the Hell's Angels gang, which the defendant denied. *Id*. The prosecutor then attempted to introduce defendant's tattoo as one commonly worn by Hell's Angels members, which defendant also denied. *Id.* The prosecutor failed to offer any evidence to controvert defendant's denial that he was a Hell's Angel or his assertion that his tatoo was not one commonly worn by its members. *Id.* Similarly, in *Jones v. State*, 385 So. 2d 1042, 1043 (Fla. Dist. Ct. App. 1980), a Florida court held that the prosecutor's insinuations during questioning of a witness that threats had been made against the witness by the accused without any attempt to show that the accused had either made such threats or was even aware that threats had been made against the witness constituted prejudicial error. *Id*.

¶45. Additionally, in *People v. Lediard*, 80 A.D. 2d 237, 240-242, 438 N.Y.S. 2d 540 (1981) a New York court held that it was error for the prosecutor to ask a witness on cross examination in an assault trial whether he knew that the defendant had displayed a pistol to a bartender on the night of the shooting which led to the assault conviction. *Id*. No such evidence was presented, and the bartender was not called to testify as a witness. The court reasoned that by implication, this question placed a gun in defendant's hands at the time of the shooting when there was no actual evidence of such, thereby causing prejudice to the defendant. *Id*. In a recent decision, the Georgia Supreme Court reversed a murder conviction on the basis that the prosecutor failed to offer any evidence of gang activity that he detailed in his opening statement. *Alexander v. State*, 1998 WL 834351 (Ga. Dec. 4, 1998). In *Alexander*, the prosecutor gave a detailed explanation in opening statement regarding how the evidence would prove the shooting in question was gang related. *Id*. at *2. The court found the prosecutor's failure to offer evidence during trial of the significant connection to gangs that he detailed in his opening statement to be so prejudicial that reversal of conviction was necessary. *Id*. at *4.

¶46. Here, the prosecutor put on no evidence during the guilt phase of any threat or that Walker was a member of a gang. Moreover, Mario Jeffries never said that he heard a direct threat from Walker. His testimony was that Walker told him not to tell anybody anything, which he *understood* to mean that Walker would shoot him if he did. We conclude the admission of the threat and gang testimony by the trial court was error.

¶47. Turning to the sentencing phase, we apply the aforementioned principles of law in our analysis. During the sentencing phase, there was only hearsay testimony on Walker's alleged gang involvement and threats to witnesses.

¶48. In the penalty phase, Cooper Epps testified that Walker scribbled signs on the cell wall they shared. However, on cross-examination, Epps admitted that he was not familiar with gang signs, had never been in gang, and that he did not know anything about gangs. There is little evidence that the prosecutor had reason to believe Epps would testify in a manner other than he did. No one testified that what Walker supposedly drew on the wall was a gang sign.

¶49. Nevertheless, again during the sentencing phase, Walker was cross-examined at length about gangs, and even more specifically, about the "Black Gangster Disciples." The prosecutor failed to call anyone to testify that Walker was actually in a gang or that he had threatened "drive-bys", a statement attributed by the

State to Toracco Jeffries. The State did not even call Toracco, who it is suggested through its questioning, supposedly heard Walker make such a threat.

¶50. Mario Jeffries testified during the sentencing phase as well. His testimony was that Walker said that Mario would not make it in prison. It is unclear from the record whether this was said directly to Mario. What is clear is that there is no evidence that the remark went further. Mario "guessed" that Walker may have been talking about prison gangs. Mario had no knowledge of whether Walker was in a gang, but surmised that Walker may have been talking about gangs because allegedly others had said Walker talked of being a gang member. That and everything else that Mario had to convey about Walker and threats or gangs was inadmissible hearsay. There was no admissible proof that Walker was a member of any gang. There was also little evidence of a direct threat in this case, as claimed by State as reason for presentation of the gang evidence. The trial court erred in permitting the prosecutor to ask the threat and gang questions, as there was no factual basis for either.

¶51. During the sentencing phase of a death penalty case, the State is limited to offering evidence that is relevant to one of the aggravating circumstances included in Miss. Code. Ann. § 99-19-101. *Jackson v. State*, 672 So. 2d at 487 (*citing **Stringer v. State***, 500 So. 2d 928, 941 (Miss. 1986). Testimony during the sentencing phase as to Walker's marking of gang signs on the cell wall was not relevant to any of the aggravating circumstances set out in § 99-19-101.[1] The State's assertion that the statements were an aid in determinating whether Walker shot Henderson to avoid arrest is specious. The statements were clearly made two years after the incident at a time when Walker was already in custody. There was no basis for the admission of any threat evidence on the factor of avoiding arrest. The admission of the above mentioned testimony injected an impermissible factor into the sentencing process. We, therefore, conclude that remand is necessary for a new sentencing hearing to re-evaluate punishment in this case.

## VI.

¶52. Walker next asserts the trial court erred in denying his motion in limine to admit testimony by Walker that he was willing to take a polygraph test. The State contends that Mississippi does not allow admission of results of a polygraph test, and that Walker waived this issue because he failed to raise it again when he took the stand to testify. This assignment should not detain us. We have adopted a bright line rule that polygraph evidence is inadmissible. ***Weatherspoon v*. *State***, 97-KA-0019-SCT, ¶11-15, 1999 WL 12828, at *5 (Miss. 1999). Therefore, this assignment fails.

## VII.

¶53. Walker next argues that the trial court erred in its ruling on various jury instructions. Walker contests the amendment to Instruction S-2A, the denial of Instruction D-A on self defense, and the denial of Instruction D-5 on provocation. Walker also alleges error by the court in granting Sentencing Instruction Number 1. The denial of peremptory Instruction D-1 will be addressed in part VIII in dealing with the question of whether the verdict was against the overwhelming weight and sufficiency of the evidence.

### *a*.

¶54. Walker first asserts the court should not have allowed the State to amend Instruction S-2A to include the language "with or without deliberate design". After amendment, Instruction S-2A read as follows:

The Court instructs that [sic] jury that the defendant, Linnox Walker, has been charged with the crime

of capital murder in the death of Bobby Dean Henderson.

If you find from the evidence in this case beyond a reasonable doubt that the defendant, Linnox Walker, on or about the 12ᵗʰ day of May, 1994, in Marshall County, Mississippi, did wilfully, unlawfully, feloniously, with or without deliberate design, then and there, kill Bobby Dean Henderson, a human being, without authority of law, when engaged in the commission of the crime of robbery, then, if you so believe from all the evidence in this case beyond a reasonable doubt, the defendant is guilty of capital murder, and it is your sworn duty to say so by your verdict.

If the State of Mississippi has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant, Linnox Walker, not guilty of capital murder in the death of Bobby Dean Henderson.

¶55. On appeal, Walker argues that the instruction should not have been allowed because it was not supported by evidence. Walker also admits in his rebuttal brief to this Court that although his objection was not specifically stated, the basis of the objection was inferred from the facts and circumstances. However, at trial, Walker objected when the court permitted the State to amend the indictment to include the "with or without deliberate design" language, and argued this fact as reason for his objection to the amendment of the Instruction S-2A.. His objection to the amendment of the indictment was on the basis that only a jury can return an indictment.

¶56. It is the rule of this Court that no assignment of error based on the giving of an instruction to the jury will be considered on appeal unless specific objection was made to the instruction in the trial court stating the particular ground or grounds for such objection. *Watson v. State*, 483 So. 2d 1326, 1329 (Miss. 1986). Further, on appeal, a party may not argue that an instruction was erroneous for a reason other than the reason assigned on objection to the instruction at trial. *Young v. Robinson*, 538 So. 2d 781, 782 (Miss. 1989). Contrary to Walker's argument, it is not apparent from the circumstances that the basis for the objection was that the instruction was not supported by the evidence. Walker's ground for objection to Instruction S-2A at trial was different from that now presented to this Court, and review of any error is thus waived.

*b*.

¶57. Walker's next contention is that the trial court erred in denying Instruction D-4 on self-defense, and Instruction D-5 on provocation.

¶58. Instruction D-4 (C-22) reads:.

The Court instructs the jury that you are not to judge the actions of Linnox Walker in the cool, calm light of after-developed facts, but instead you are to judge the defendant's actions in the light of the circumstances confronting him on May 12, 1994 at the Speed Shop in Marshall County, MS as you believe from the evidence that those circumstances appeared to the defendant on that occasion and if you believe that under those circumstances that it reasonably appeared to Linnox Walker that he then and there had a reasonable ground to apprehend design on the part of Bobby Dean Henderson to kill the defendant or to do the defendant some great personal injury, and that there appeared to be imminent danger of such design being accomplished then the defendant was justified in anticipating an attack by Bobby Dean Henderson then you must find Linnox Walker not guilty.

¶59. Instruction D-5 (C-23) reads:

> The Court instructs the jury that the killing of any human being by the act of another shall be excusable when committed upon any sudden and sufficient provocation.
>
> In this case, if you shall find from the evidence, or have a reasonable doubt therefrom, that Linnox Walker upon any sudden and sufficient provocation by Bobby Dean Henderson killed on May 12, 1994 at the Speed Shop in Marshall County, MS, then it is your sworn duty to acquit Linnox Walker.

¶60. Walker claims that D-4 should have been granted because the evidence presented supports a self-defense instruction. He offers the same argument as reason why D-5 on provocation should have been granted.

¶61. Jury instructions should given only if they are applicable to the facts developed in the case being tried. *Lancaster v. State*, 472 So. 2d 363, 365 (Miss. 1985) (*citing* *Pittman v. State*, 297 So. 2d 888, 893 (Miss. 1974). To grant an instruction that is not supported by the evidence would be error. *Id.*

¶62. As support for both the self-defense and provocation instructions, Walker makes reference to testimony by Mario Jeffries that when Walker came out of the store, he told Jeffries that the "dude made a move on him." Under the circumstances of a robbery, none of this excuses a killing. There is no evidence that anything but a robbery was afoot. We conclude, therefore, that the evidence does not support either the self-defense or provocation instructions in this case. The court does not have to submit such an instruction if there is no reasonable basis upon which a jury may rationally conclude that the accused had not actively participated in a robbery and subsequent killing to escape therefrom. *Layne v. State*, 542 So. 2d 237, 243 (Miss. 1989). Thus, the trial court did not err in refusing Instructions D-4 and D-5.

*c*.

¶63. Walker contends the State adduced no evidence to support part B, paragraph 1 of Sentencing Instruction Number 1, which reads:

> The capital offense was committed for the purpose of avoiding or preventing a lawful arrest.

¶64. If there is evidence from which it may be reasonably be inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to "cover their tracks" so as to avoid apprehension and eventual arrest by authorities, then it is proper for the court to allow the jury to consider the aggravating circumstance of avoiding or preventing lawful arrest. *Brown v. State*, 682 So. 2d 340, 355 (Miss. 1996) (*citing* *Leatherwood v. State*, 435 So. 2d 645, 651 (Miss. 1983). In *Brown,* as in the present case, there was no evidence that the defendant was disguised when he entered or left the store at which the shooting took place. *Id.*

¶65. Walker was a frequent patron of the store and admitted that he had seen weapons kept behind the cash register at the store. Henderson knew Walker from his visits to the store to buy beer. At no time during the commission of the robbery and murder did Walker wear a mask or any other disguise to hide his identity. Based on the record evidence, it could be reasonably inferred that Walker's substantial reason for shooting Henderson was to avoid or prevent arrest. We conclude, therefore, that the trial court properly granted the avoiding or preventing lawful arrest instruction.

## VIII.

¶66. Walker argues that the verdict is against the overwhelming weight and sufficiency of the evidence. Walker asserted in assignment seven that his peremptory instruction for the jury to return a verdict of not guilty should have been granted. That assignment will be considered here with Walker's claim on the weight and sufficiency of the evidence.

¶67. In determining whether a jury verdict is against the overwhelming weight of the evidence, we must accept as true the evidence which supports the verdict. *Robinson v. State*, 662 So. 2d 1100, 1104 (Miss. 1995). The test is whether the verdict is so contrary to the overwhelming weight of the evidence that to allow the verdict to stand would be to sanction an unconscionable injustice. *Jackson v. State*, 551 So. 2d 132, 148 (Miss. 1989). The Court is required to accept as true all the evidence favorable to the State, together with reasonable inferences arising therefrom, to disregard that evidence favorable to the defendant, and if such evidence will support a verdict of guilty beyond a reasonable doubt, the peremptory instruction should be refused. *Berry v. State*, 703 So. 2d 269, 288 (Miss. 1997). The jury verdict should be set aside only if it appears the lower court has abused its discretion. *Crenshaw v. State*, 520 So. 2d 131, 135 (Miss. 1988). This Court reverses a jury verdict only where "reasonable men could not have found beyond reasonable doubt the accused was guilty." *Carr v. State*, 655 So. 2d 24, 837 (Miss. 1995).

¶68. Walker argues that the conviction is predicated on circumstantial evidence, and that the only substantial evidence offered by the State was testimony from Mario Jeffries and Cooper Epps.

¶69. A review of the record evidence shows that both Jeffries and Walker participated in the robbery of the store. Jeffries testified that Walker went into the store armed with a gun to rob. While Walker was in the store, Jeffries heard a gunshot, then Walker came out of the store with the cash drawer and .357 chrome pistol that he believed belonged to Henderson. They both went to the home of Ms. Regina Wiley after leaving the store. There, Jeffries witnessed Walker counting $1,700 taken from the store. Walker's response to Jeffries question of whether he killed Henderson was, "What do you think?"

¶70. Anthony Gardner testified that Walker told him that he shot Henderson and robbed the store. There was also testimony from Cooper Epps that Walker admitted the crimes. Epps further testified that when he asked Walker how the man was killed, Walker's response was "in the head down on his knees." Epps did not know Walker before this case and had not heard of the robbery and murder.

¶71. Although Walker questions the testimony of Jeffries and Epps, the verdict shows that the jury found the State and its witnesses to be more credible. Walker especially argues against the testimony of Jeffries, who was with Walker at the time of the crime. This Court has held that a conviction may be supported by the testimony of an accomplice, even when it is uncorroborated; it is only required that the accomplice's testimony be reasonable and not improbable, self-contradictory, or substantially impeached. *Winters v. State*, 449 So. 2d 766 (Miss. 1984). If there is substantial evidence consistent with the verdict, evidence which is of such weight and quality that, keeping the burden of proof of beyond a reasonable doubt in mind, fairminded jurors in exercise of impartial judgment might reach different conclusions," the jury's verdict should be allowed. *Bounds v. State*, 688 So. 2d 1362, 1372 (Miss. 1997).

¶72. The jury observed the witnesses and heard their testimony. The jury did have sufficient evidence to find Walker guilty and the verdict was not against the overwhelming weight of the evidence. Considering all evidence in favor of the State, the trial court properly refused Walker's peremptory instruction.

## IX.

¶73. Lastly, Walker alleges the sentence imposed by the jury is cruel and unusual punishment in violation of the eighth amendment to the United States Constitution.

¶74. Walker's argument that the sentence is cruel and unusual is based on the fact that the State's case rested heavily on the testimony of Epps and Jeffries. However, this Court has upheld the imposition of the death penalty in cases similar to Walker's. *Holly v. State*, 671 So. 2d 32, 40 (Miss. 1996) (testimony of accomplice is sufficient to sustain sentence of death). In *Culberson v. State,* 379 So. 2d 499 (Miss. 1979), an accomplice was permitted to plead to manslaughter while the trigger man given the death penalty. This Court reasoned that the State is given some discretion in securing testimony of one of the participants in a crime committed by two or more persons in order to solve the crime. *Id* at 509-10. This Court has also held the imposition of the death penalty for murder is not cruel and unusual punishment. *Coleman v. State*, 378 So. 2d 640, 646 (Miss. 1979). This assignment fails.

## X.

¶75. In addition to considering the merits of the case, this Court is to consider factors listed in Miss. Code Ann. § 99-19-105 in analyzing the sentence imposed. Under § 99-19-105, the Court is directed to consider, with regard to the sentence, (a) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (b) whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101; and (c) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Miss. Code Ann. § 99-19-105 (3)(c)(Supp. 1998).

¶76. In this case, Walker's conviction was based substantially on the testimony of his accomplice, Mario Jeffries, who pled guilty to manslaughter and received a sentence less than death. There was also testimony from Anthony Gardner and Cooper Epps that Walker had confessed to them.

¶77. In *Culberson*, factually similar to the present case, this Court concluded that the testimony of an admitted accomplice in a capital murder case, sufficient to sustain a conviction in the guilt phase, is sufficient to sustain the death penalty in the sentencing phase. 379 So. 2d at 509-10. The Court also upheld a sentence of death in *Holly*, 671 So. 2d at 40, where conviction based on testimony of accomplice was found to be sufficient.

¶78. However, the problem with the present case arises from other factors the Court is to consider under § 99-19-105. During the sentencing phase, testimony was improperly permitted concerning threats allegedly made by Walker and of gang affiliation by Walker, which the State alleged went to the aggravating circumstance of avoiding prosecution and arrest. As support for this factor, the State attempted to present evidence of threats made to witnesses by Walker and evidence of Walker's affiliation with the "black gangster disciples" without proof that any threats were actually made or that Walker was even a member of any gang. The admission of this testimony was an impermissible, arbitrary factor which the jury considered in its imposition of the death penalty in this case that did prejudice the defendant. As such, this Court concludes the sentence of death be reversed, and this case be remanded for a new sentencing hearing.

## XI.

¶79. We remand this case to the Circuit Court of Marshall County for a *Batson* hearing and for a new sentencing hearing. If discrimination is found in the *Batson* hearing, a new trial as to guilt should be ordered. If no discrimination is found, the trial court should by opinion and order make its factual findings, certifying them to this Court. In any event, there shall be a new trial as to sentencing.

¶80. **REVERSED AND REMANDED.**

**PRATHER, C.J., SULLIVAN, P.J., AND McRAE, J., CONCUR. MILLS, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION JOINED BY PITTMAN, P.J., AND WALLER, J. SMITH AND COBB, JJ., NOT PARTICIPATING.**


**MILLS, JUSTICE, SPECIALLY CONCURRING:**


¶81. I specially concur in the result reached by the majority in this case to the extent that we remand for a *Batson* hearing. While I concur in most of the opinion, I do not agree that the facts of this case are sufficiently developed to allow this Court to find error regarding the defendant's marking of gang signs and threats to others. It is quite likely, as the State argued, that these actions were taken to avoid prosecution or to intimidate witnesses. Therefore, I specially concur.

**PITTMAN, P.J., AND WALLER, J. JOIN THIS OPINION.**


1. The eight aggravating circumstances are as follows: a) the capital offense was committed by a person under sentence of imprisonment; b) the defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person; c) the defendant knowingly created a great risk of death to many persons; d) the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, . . . .; e) the capital offense was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; f)the capital offense was committed for pecuniary gain; g) the capital offense was committed to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws; h) the capital offense was especially heinous, atrocious, or cruel.