585 So.2d 1262 (1991)
Randy BUSH
v.
STATE of Mississippi.
No. 90-KA-0247.
Supreme Court of Mississippi.
August 28, 1991.
Mose Lee Sudduth, Jr., Columbus, for appellant.
Mike C. Moore, Atty. Gen., Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and BANKS, JJ.
SULLIVAN, Justice, for the Court:
In its February 1989 term, the Lowndes County Grand Jury returned an indictment against Randy Bush charging that he did unlawfully, wilfully and feloniously, knowingly and intentionally sell a controlled substance, to-wit: cocaine, to Thomas Whaley, for and in consideration of $25.00. Bush *1263 was tried and found guilty as charged. He was sentenced to fifteen years and was ordered to pay a fine of $20,000.00. Bush appeals.

FACTS
Thomas Whaley was arrested by the Mississippi Bureau of Narcotics on November 28, 1988, for the sale of marijuana and possession of cocaine. As a result, he agreed to help the Bureau by making drug buys from others in the community. In return, the Bureau told Whaley that the D.A. would be told that Whaley had cooperated with the Bureau.
Whaley talked to Bureau agents about making buys from certain people, one of whom was Randy Bush. Whaley had known Bush for eight or nine years. On December 4, 1988, the agents asked Whaley to call Bush.
Whaley asked Bush over the phone if he had any cocaine for sale, and Bush said he had a quarter of a gram left. Bush told Whaley he could come and get it. The call was placed from the Narcotics Office. Agents Bobby Grimes, Craig Taylor, Joey Brackin, and Danny Starks were present. The conversation was taped.
Whaley was wired with a body mike and was given a twenty dollar bill and a five dollar bill. Agent Brackin said that Whaley did not mention the twenty-five dollar figure during his phone conversation with Bush. Whaley testified that twenty-five dollars was what was usually charged for a quarter of a gram.
Whaley arrived at Bush's trailer between 5:30 and 6:00 p.m. while the agents parked down the road and waited. Whaley went into the trailer and talked to Bush a few minutes before buying the quarter gram. The cocaine was in a corner of a plastic bag. Whaley asked Bush about getting some more. Bush made a phone call to someone and then told Whaley that he could not get any more that day. A tape recording was made of the transaction.
Whaley said that he did not make any threats or promises to Bush in order to get him to sell the cocaine. He said that he had not talked to Bush during the period between his arrest on November 28, 1988, and December 4, 1988, when Bush sold him the cocaine. Bush, on the other hand, claimed that Whaley came by his trailer before the 4th asking for some cocaine. Bush told Whaley that he did not fool with cocaine any more but Whaley just kept coming back. On the 4th, Bush gave Whaley the cocaine because he thought by doing so, Whaley would quit bothering him. Bush said that he received no money from Whaley for the cocaine.
Bush presented two witnesses who testified that Whaley had been at Bush's trailer several times prior to the 4th. David Bush, Randy's brother, said that he had seen Whaley at Randy's house five or six times with a week's period during the last week of November and the first week of December. Steve Wright testified that he saw Whaley at Randy's three times during the first week of December when Wright was spending the weekend with Billy Bush, another of Randy's brothers. He said that he remembered it because he had just heard that Whaley had busted some other guy he knew.
After purchasing the cocaine, Whaley met Agent Brackin down the road. Whaley delivered the cocaine to him. Agent Brackin placed the cocaine in a brown envelope to be delivered to the Mississippi Crime Lab. At trial, it was stipulated that the substance was cocaine.

I.
Bush first challenges the verdict on the basis that the overwhelming weight of the evidence proved that he was entrapped. When a challenge is made to the legal sufficiency of the evidence, our standard requires that we consider
all of the evidence  not just that supporting the case for the prosecution  in the light most consistent with the verdict. We give the prosecution the benefit of all favorable inferences that may reasonably be drawn from the evidence. If the facts and inferences so considered point in favor of the accused with sufficient force that reasonable men could not *1264 have found beyond a reasonable doubt that he was guilty, reversal and discharge are required. On the other hand, if there is in the record substantial evidence of such quality and weight that, having in mind the beyond a reasonable doubt burden of proof standard, reasonable and fairminded jurors in the exercise of impartial judgment might have reached different conclusions, the verdict of guilty is thus placed beyond our authority to disturb.
Benson v. State, 551 So.2d 188, 192-193 (Miss. 1989) [quoting McFee v. State, 511 So.2d 130, 133-134 (Miss. 1987)].
Entrapment is defined as "the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him in its commission and prosecuting him for the offense." Phillips v. State, 493 So.2d 350, 354 (Miss. 1986) [quoting McLemore v. State, 241 Miss. 664, 675, 125 So.2d 86, 91 (1960)]. If, however, the crime had already existed in the mind of the defendant and the request or inducement merely acted as an opportunity to commit what was in his mind, entrapment is no defense. King v. State, 530 So.2d 1356, 1359 (Miss. 1988); Phillips, 493 So.2d at 354.
The defense of entrapment is affirmative and must be proven by the defendant. The burden of proof does not shift to the State to show the predisposition for committing the crime until the defendant has made out a prima facie case of entrapment. Ervin v. State, 431 So.2d 130, 134 (Miss. 1983); Turner v. State, 415 So.2d 689, 693 (Miss. 1982).
Most of the cases addressing the defense of entrapment deal with the question of whether the jury should have been instructed on entrapment. As we said in Moore v. State, 534 So.2d 557, 559 (Miss. 1988), where the jury is instructed on entrapment and "[w]here the jury resolves the point against the defendant, he is generally out of luck on appeal."
The court in this case allowed the jury to be instructed on the defense of entrapment. Although Bush offered two witnesses who said that they had seen Whaley at Bush's trailer several times during the last week of November and the first week of December, Bush does not offer any witnesses who were present when Whaley supposedly talked to Bush. The jury clearly rejected Bush's defense of entrapment and chose to believe, instead, that Bush was predisposed to commit the crime. Viewing the evidence in the light most consistent with the verdict, we affirm on this issue.

II.
During Bush's trial, an assistant attorney general, John Holiman, assisted the District Attorney. Bush contends that it was error for Holiman to participate in the trial because he had not been authorized to do so in writing as required by Miss. Code Ann. § 7-5-53. That section provides that:
The Attorney General shall, when required by the public service or when directed by the Governor, in writing, repair in person, or by any regular or specially designated assistant, to any county or district in the state and assist the district attorney there in the discharge of his duties and in any prosecution against a state officer, and shall have the same right as the district attorney to enter the grand jury room while the grand jury is in session and to perform such services with reference to the work of the grand jury as the district attorney is authorized by law to perform.
The words, "in writing" which immediately follow the phrase "when directed by the Governor," were added in 1988.
The statute allows the attorney general to assist district attorneys under two circumstances, when required by the public service or when directed by the Governor, in writing. Bush argues that the phrase "in writing" means that the attorney general can never assist the district attorney unless he has been authorized to do so in writing. However, common sense suggests that the words "in writing" refer only to a directive by the Governor and not when the attorney general's assistance is *1265 required by the public service. This argument is without merit.

III.
During voir dire, the potential jurors were asked by the court, "Do any of you know either counsel from any professional, business, or social relationship?" Juror Greg Belue did not respond to the question. During the hearing on Bush's motion for new trial, Belue testified that in May of 1985, while playing in organized softball, he saw Bush's attorney, Mose Sudduth, during a ballgame. Belue was playing second base during the game, and Sudduth slid into second base and clipped Belue in the leg. After the game, Sudduth came up to Belue to see if he was O.K. Since that time, Belue had not seen Sudduth. As a result of the collision at second base, Belue suffered torn ligaments and cartilage. He had to undergo surgery and wear a cast for twelve to fourteen weeks.
Bush contends that he was denied his right to use a peremptory challenge on Belue because Belue failed to indicate that he knew Sudduth. As support, he cites Odom v. State, 355 So.2d 1381 (Miss. 1978).
Odom sets forth the criteria which should be considered by the trial judge when one of the grounds for a motion for a new trial is the fact that a juror failed to respond to a direct and unambiguous question which was asked by defense counsel during voir dire, thus depriving counsel the right to exercise a peremptory challenge intelligently. The court must determine if the question asked the juror was:
(1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited. If the trial court's determination of these inquiries is in the affirmative, the court should then determine if prejudice to the defendant in selecting the jury reasonably could be inferred from the juror's failure to respond. If prejudice reasonably could be inferred, then a new trial should be ordered. It is, of course, a judicial question as to whether a jury is fair and impartial and the court's judgment will not be disturbed unless it appears clearly that it is wrong. (Citation omitted).
Odom, 355 So.2d at 1383.
Belue said that the ballgame was the only time he had ever seen Sudduth and that he did not know Sudduth professionally or socially. He explained that he knows Sudduth in the sense that he knows President Bush. In other words, he knows him when he sees him but he does not really know him. Belue said he feels no ill-will towards Sudduth for the injury he received and the incident did not color his judgment during Bush's trial.
The trial court considered the Odom criteria in making its findings on this issue and found that the question was relevant and unambiguous. However, the court determined that Belue did not have substantial knowledge of the information sought to be elicited since, at the time he was questioned, "he did not recognize Mr. Sudduth... . It was only sometime thereafter that he placed Mr. Sudduth as being the individual who had collided with him at a ballgame in May, 1985." Because the incident in question occurred three years prior to the trial and Belue had not seen Sudduth since that time and because Belue said that the incident did not color his judgment, we cannot say the findings of the trial court are clearly wrong. We affirm on this issue.

IV.
After both sides had exercised their challenges during jury selection, the defendant questioned the prosecution's choice of jurors.
BY MR. SUDDUTH: Your Honor, one second. May I ask Mr. Ralph why all these challenges were blacks. I don't understand.
BY THE COURT: I don't have any idea.
BY MR. SUDDUTH: I just want to know if there is a reason.
BY MR. HOLIMAN: I don't think this is a Batson case.

*1266 BY MR. SUDDUTH: I think you're cutting blacks because they're sympathetic. I assume you're not just cutting because they're black.
BY MR. HOLIMAN: My reason, if you wish me to state it in the record is strictly age. I'm trying to strike the youngest people on the jury and in this situation it may be that they're black.
BY MR. SUDDUTH: There are some young white folks and you didn't strike them.
BY MR. HOLIMAN: Is this in the form of a motion Mr. Sudduth?
BY THE COURT: I think that's what he is making on the motion.
BY MR. HOLIMAN: Well I think we need to make a decent record. I don't think that I can do it here with the jury sitting here.
BY MR. SUDDUTH: Well my understanding is that you just struck folks because they're young and black.
BY MR. HOLIMAN: I can give reasons your Honor. I feel that I can give them better in open court without trying to whisper.
BY MR. SUDDUTH: Well you've already said you cut them because they were young.
BY MR. HOLIMAN: Your Honor, he's trying to cut off my argument. What I would like to do is  I don't want to try to make my argument here. I'd rather go back and get my notes and 
BY THE COURT: The Court is  for purposes of the record, you have stated your reasons, Mr. Sudduth has made his motion and the Court overrules his motion and further for the purposes of the record, the defendant is not identified as a member of any racially minority group.
Before trial started, the court allowed the record to reflect the fact that five of the thirteen jurors were black.
Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) requires that the defendant prove the existence of three factors in order to make a prima facie showing of discrimination before the prosecution will be compelled to give a racially neutral reason for the use of a peremptory challenge. Those factors are:
1. That he is a member of a `cognizable racial group';
2. That the prosecutor has exercised peremptory challenges toward the elimination of veniremen of race, and
3. That facts and circumstances infer that the prosecutor used his peremptory challenges for the purpose of striking minorities.
Lockett v. State, 517 So.2d 1346, 1349 (Miss. 1987).
Batson involved a situation where the defendant was himself a member of the same minority group which was excluded from the jury. Two recent United States Supreme Court decisions have gone beyond Batson to discuss the use of peremptory challenges to exclude members of a minority when the defendant is not himself a member of the minority group which has been excluded.
In Holland v. Illinois, 493 U.S. 474, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990), the white defendant objected to the exclusion of two black jurors on Sixth Amendment grounds. He contended that he had the right to be tried by a representative cross-section of his community. The defendant asked the Court to incorporate the Batson test into the Sixth Amendment so that a defendant, no matter what race, would be able to establish a prima facie violation of the Sixth Amendment when blacks are excluded from the jury.
The Supreme Court declined to accept the defendant's proposal. The Court said:
The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a representative jury (which the Constitution does not demand), but an impartial one (which it does). Without that requirement, the State could draw up jury lists in such manner as to produce a pool of prospective jurors disproportionately ill disposed towards one or all classes of defendants, and thus more likely to yield petit juries with similar disposition. The State would have, in effect, unlimited peremptory challenges to compose the pool in its *1267 favor. The fair-cross-section venire requirement assures, in other words, that in the process of selecting the petit jury the prosecution and defense will compete on an equal basis.
But to say that the Sixth Amendment deprives the State of the ability to `stack the deck' in its favor is not to say that each side may not, once a fair hand is dealt, use peremptory challenges to eliminate prospective jurors belonging to groups it believes would unduly favor the other side. Any theory of the Sixth Amendment leading to that result is implausible.
Holland, 493 U.S. at ___, 110 S.Ct. at 807-808, 107 L.Ed.2d at 916-917.
The Court limited its holding in Holland to claims based on the Sixth Amendment. In other words, although a white defendant did not have a valid challenge to the exclusion of black jurors under the Sixth Amendment, the Court was not saying that the defendant did not have a valid constitutional challenge at all.
On April 1, 1991, the Supreme Court decided Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). The white defendant in that case grounded his objections to the exclusion of black jurors on Batson. His objections were overruled by the lower court. On appeal, the defendant argued that the Equal Protection Clause had been violated because the prosecution used its peremptory challenges to exclude members of a minority. The Ohio Court of Appeals affirmed the lower court's decision.
The Supreme Court agreed with the defendant that potential jurors cannot be excluded from the jury through use of peremptory challenges because of their race, even when the defendant and the excluded jurors are not members of the same race. The Court distinguished the defendant's argument, which was based on the Equal Protection Clause, from the argument made in Holland, which was based on Sixth Amendment grounds. The Court said:
We hold that the Equal Protection Clause prohibits a prosecutor from using the State's peremptory challenges to exclude otherwise qualified and unbiased persons from the petit jury solely by reason of their race, a practice that forecloses a significant opportunity to participate in civic life. An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.
... Race cannot be a proxy for determining juror bias or competence. "A person's race simply `is unrelated to his fitness as a juror.'" Batson, supra, [476 U.S. at] 87 [106 S.Ct. at 1718] (quoting Thiel v. Southern Pacific Co., supra, [328 U.S. 217 at 227, 66 S.Ct. 984 at 989, 90 L.Ed. 1181 (1946)] (Frankfurter, J., dissenting)). We may not accept as a defense to racial discrimination the very stereotype the law condemns.
We reject as well the view that race-based peremptory challenges survive equal protection scrutiny because members of all races are subject to like treatment, which is to say that white jurors are subject to the same risk of peremptory challenges based on race as are all other jurors... . This idea has no place in our modern equal protection jurisprudence.
Powers, ___ U.S. at ___, 111 S.Ct. at 1370, 113 L.Ed.2d at 424-425.
The Court said that its holding was not inconsistent with Batson which emphasizes racial identity. "Racial identity between the defendant and the excused person might in some cases be the explanation for the prosecution's adoption of the forbidden stereotype, and if the alleged race bias takes this form, it may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred." Id. at ___, 111 S.Ct. at 1373, 113 L.Ed.2d at 429.
Under Powers, a white defendant now has standing to object to the use of peremptory challenges on potential black jurors. In essence, the first factor required by Batson has been eliminated. To establish a prima facie case of discrimination using the Batson criteria, a white defendant *1268 must show that the prosecutor has used peremptory challenges on persons of race and that the circumstances give rise to the inference that the prosecutor used the peremptory challenges in order to strike minorities.
Once the defendant has established a prima facie case of discrimination to the satisfaction of the trial court, the prosecution must supply reasons which are racially neutral for using its peremptory challenges on minority members. Batson, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88. The prosecutor does not have to provide the same degree of justification for a peremptory challenge as is required for a challenge for cause. Benson v. State, 551 So.2d 188, 192 (Miss. 1989); Wheeler v. State, 536 So.2d 1347, 1351 (Miss. 1988).
The defendant is allowed to rebut the reasons which have been offered by the prosecution. Taylor v. State, 524 So.2d 565 (Miss. 1988). When the defendant offers no rebuttal, the court is forced to examine only the reasons given by the prosecution. Johnson v. State, 529 So.2d 577, 584 (Miss. 1988).
The record in this case does not contain enough information to allow this Court to make a determination as to whether the prosecution used its peremptory challenges to exclude members of a minority. The State used five of its peremptory challenges. Whether the prosecution used its peremptory challenges on blacks is not specified in the record, other than defense counsel's question as to why all the challenges were used on blacks.
After the defendant objected, the prosecution indicated that it was trying to strike the youngest people on the jury. In rebuttal, the defendant stated that there were some young white people on the jury who were not excluded by the prosecution. At that point, the prosecution wanted to make a more complete record, but the court cut off any further argument by overruling the defendant's motion.
In light of the recent holding of the U.S. Supreme Court in Powers v. Ohio, we must remand this case to the lower court for a Batson hearing. As it now stands, the record does not contain sufficient information from which we can make a determination as to whether the prosecution used its peremptory challenges to exclude potential jurors solely on the basis of race. If the court finds that the prosecution has discriminated on the basis of race, the court must order a new trial. If the court does not make a finding of discrimination, the cause should be certified to this Court, along with the record of the hearing and finding of fact by the lower court.
REMANDED FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, PITTMAN, BANKS and McRAE, JJ., concur.