# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 2000-KA-01902-COA

**GEORGE D. AGUILAR A/K/A GEORGE DIAZ AGUILAR A/K/A JAY AGUILAR**                                        **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                        **APPELLEE**

DATE OF TRIAL COURT JUDGMENT: 10/13/2000

TRIAL JUDGE:                               HON. LARRY EUGENE ROBERTS

COURT FROM WHICH APPEALED:     LAUDERDALE COUNTY CIRCUIT COURT

ATTORNEY FOR APPELLANT:         JAMES A. WILLIAMS

ATTORNEY FOR APPELLEE:          OFFICE OF THE ATTORNEY GENERAL

                                 BY:  CHARLES W. MARIS JR.

DISTRICT ATTORNEY:              BILBO MITCHELL

NATURE OF THE CASE:             CRIMINAL - FELONY

TRIAL COURT DISPOSITION:        MANSLAUGHTER - SENTENCED TO 20 YEARS

DISPOSITION:                    AFFIRMED - 09/24/2002

MOTION FOR REHEARING FILED:

CERTIORARI FILED:

MANDATE ISSUED:

BEFORE KING, P.J., BRIDGES, AND CHANDLER, JJ.

CHANDLER, J., FOR THE COURT:

¶1. On March 30, 2000, George Aguilar was indicted by the Lauderdale County grand jury on the charge of manslaughter. The day of the trial the indictment was amended to charge Aguilar as a habitual offender. Aguilar was tried on August 16, 2001, and the jury found him guilty. The trial court then sentenced him to twenty years' imprisonment without the possibility of parole. Aguilar raises the following issues on appeal:

**I. WHETHER THE TRIAL COURT ERRED BY OVERRULING AGUILAR'S *BATSON* OBJECTIONS.**

**II. WHETHER THE TRIAL COURT ERRED IN FAILING TO RULE THAT AGUILAR'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL.**

**III. WHETHER THE JURY'S VERDICT IS CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE**

**IV. WHETHER THE TRIAL COURT ERRED BY REFUSING TO ADMIT EVIDENCE**

**PERTAINING TO SPECIFIC BAD ACTS OF THE DECEASED VICTIM.**

Finding no error, we affirm.

## FACTS

¶2. Tammy and Bo Hudson had been divorced for more than six months prior to the events occurring on November 19, 1999. They had three children together. Bo, not living far from Tammy, would often walk down to Tammy's house and visit the children. On the night in question, Tammy gave Bo permission to come down to her house in order to cut their children's hair. Before Bo arrived at the house, Joshua Conroy, Tammy's new boyfriend, along with George Aguilar, Jeremy Dubose and Allen Chanes unexpectedly arrived. Tammy, fearing that Bo might become jealous upon seeing Joshua, immediately attempted to call Bo in order to keep him from coming down to the house. Despite her efforts, Tammy was unable to reach Bo on the telephone. Tammy testified that she had asked Aguilar on several previous occasions never to return to her house.

¶3. When Bo arrived, he found Tammy and Joshua in the back bedroom. He made a comment to Tammy and left the house for approximately ten minutes. When he came back, he demanded to speak with Tammy outside the presence of the four other men. Tammy refused to go outside; however, she allowed Bo to enter the house. After entering the house, Bo began pushing Tammy into the dining room. Aguilar jumped up, stating "Man, don't be pushing on her." Tammy testified that she was in no fear of Bo at that time. Nonetheless, words were exchanged between Bo and Aguilar and a fight ensued. Several of the men jumped on Bo and proceeded to punch and kick him. The men made their way outside and the fighting continued for several minutes in the front yard. Tammy ran in the house and called the police. By the time the police arrived, the fight had ended and Bo, accompanied by Tammy's next door neighbor, had left the scene.

¶4. Approximately twenty minutes later, Joshua went outside to look for his wallet which was lost during the fight. He was immediately confronted by three men, two of them were Bo's brothers; a second fight ensued. Tammy, never leaving the inside of her house, called the police again. Aguilar had gone outside to help stop the fight. He returned to the kitchen and picked up a knife. At some point Bo entered the house and, according to the defense, hit Tammy in the head with a brick. At that moment Aguilar stabbed Bo in the chest with the knife. Bo fell backwards, telling his brothers that he had been stabbed. Several minutes later Bo died.

## LAW AND ANALYSIS

### I. DID THE TRIAL COURT ERR WHEN IT OVERRULED AGUILAR'S *BATSON* OBJECTION?

¶5. Upon initial review of the record, we determined that the trial judge had not rendered the required on-the-record findings as to the reasons for accepting the State's race-neutral justifications for striking two African American jurors. Therefore, pursuant to *Hatten v. State,* 628 So. 2d 294, 298 (Miss. 1993), we remanded the case, ordering that the record be supplemented with the appropriate findings of fact and conclusions of law. Now, with the complete record before us, we find adequate evidence to support the

conclusion that Aguilar failed to carry the burden of proving racial discrimination.

¶6. Determinations made by the trial judge under *Batson* are factual and largely based on credibility. *Puckett v. State,* 788 So. 2d 752, 756 (¶8) (Miss. 2001); *McGilberry v. State,* 741 So. 2d 894, 923 (¶118) (Miss. 1999). Accordingly, we grant the trial judge a substantial degree of deference and will not reverse unless the findings are clearly erroneous or against the overwhelming weight of the evidence. *Simon v. State,* 679 So. 2d 617, 622 (Miss. 1996). *See also Hughes v. State,* 735 So. 2d 238, 251 (¶37) (Miss. 1999) (noting that the trial judge, as a fact finder, is always in the best position to evaluate the credibility of the strikes).

¶7. Aguilar alleges that the State's use of two of its peremptory challenges against African Americans constituted a violation of *Batson v. Kentucky,* 476 U.S. 79, 96-97 (1986). Aguilar contends that the trial court erred in finding that the State had offered racially-neutral reasons for exercising its peremptory strikes. Specifically, Aguilar argues that the State justified the striking of two African American jurors by arguing that they had felons in their families while specifically failing to challenge a white juror who also admitted having a felon in his family.

¶8. The *Batson* line of cases prohibits the use of peremptory strikes as a vehicle for racial discrimination in criminal proceedings. *Stewart v. State,* 662 So. 2d 552, 557 (Miss. 1995). This purpose is effectuated through a three step process:

> First, the defendant must establish a prima facie case that race was the criteria for the exercise of the peremptory challenge . . . . Second, should the defendant make such a showing, the striking party then has the burden to state a racially neutral explanation for the challenged strike. If a racially neutral explanation is offered, the defendant may rebut the explanation. Finally, the trial court must make a finding of fact to determine if the defendant has proved purposeful discrimination.

*Magee v. State*, 720 So. 2d 186, 188 (¶7) (Miss. 1998) (citations omitted).

### A. Prima Facie Case

¶9. Although Aguilar failed to offer any proof or argument that the State's strikes were racially discriminatory, other than the fact that two African Americans had been struck, the trial judge concluded that a prima facie case of discrimination had been established. The State provided its race-neutral reasons for the two strikes; therefore, the question of whether a prima facie case had been established became moot. *See Snow v. State,* 800 So. 2d 472, 478 (¶11) (Miss. 2001). As such, our analysis will focus on the second and third prongs of *Batson*.

### B. Race-Neutral Explanations

¶10. After the opponent of the strike establishes a prima facie case of discrimination, the burden shifts to the proponent to advance race-neutral reasons for striking a member of a distinct racial group. *Bush v. State,* 585 So. 2d 1262, 1268 (Miss. 1991). The proponent, however, does not have to articulate the same degree of justification that would be required to satisfy a strike for cause. *Id.* Rather, "any reason that is not facially violative of equal protection will suffice." *Stewart,* 662 So. 2d at 558. *See also Randall v. State,* 716 So. 2d 584, 588 (¶16) (Miss. 1998) (stating that "[u]nless a discriminatory intent is inherent in the [proponent's] explanation, the reason offered will be deemed race neutral"). The sole inquiry under step two is whether the explanations given are facially violative of equal protection. *Puckett,* 788 So. 2d at 760

(¶17).

¶11. The State first struck Alice Mosley, an African American female, arguing that she had a felon in her family but refused to mention this fact during voir dire for the case *sub judice*. Likewise, the State struck Darrel Allen, an African American male, contending that Allen not only had a brother who had served many years in prison, but also lived in the area of the crime. It has been recognized that a juror may be peremptorily struck where it is shown that he or she had family members with criminal records. *Magee,* 720 So. 2d at (¶9); *Jones v. State,* 801 So. 2d 751, 759 (¶22) (Miss. Ct. App. 2001). The State's reasons for striking Mosley and Allen clearly satisfy this prong of the test. Whether the State was required to also strike a white juror who admitted having a felon in his family is an issue to be analyzed under the third prong of *Batson.*

## C. Pretext

¶12. The final prong of *Batson* requires the trial court to determine whether the opponent has met the overall burden of proving purposeful discrimination. This determination turns on whether the proponent's proffered reasons for the strikes are pretextual. *Henley v. State,* 729 So. 2d 232, 240 (¶38) (Miss. 1998). Once the proponent offers a racially neutral explanation, the opponent may attempt to rebut the explanation. *Bush,* 585 So. 2d at 1268. If the defendant offers no rebuttal, the trial court is forced to limit its examination to only the reasons offered by the State. *Id.*

¶13. "To meet the burden of proving that the striking party exercised its peremptory challenges in a discriminatory manner, the complaining party may employ a comparative analysis of minority and non-minority jurors to show disparate treatment." *Magee,* 720 So. 2d at 189 (¶12). Disparate treatment between similarly situated jurors is strong evidence of discriminatory intent. *Berry v. State,* 802 So. 2d 1033, 1039 (¶10) (Miss. 2001). However, the disparate treatment is only one of many factors to be taken into account by the trial court; when considered along with the other factors, it is not conclusive proof of discriminatory treatment. *Id.* "Where the State is able to articulate additional race-neutral reasons for striking the juror in question and uses peremptory strikes against jurors of another race based upon the same articulated reason, we have held that the theory of disparate treatment must fail." *Id.*

¶14. In the present case, we find that the jurors are not so similarly situated as to give rise to the finding of pretext. The judge's findings indicate that Alice Mosley testified during a previous voir dire that she had a felon in her family. When asked by a different assistant district attorney during voir dire for the case *sub judice* whether there were veniremen with felons in their families, Mosley remained silent. The State later moved to have her peremptorily struck, stating that Mosley either had a felon in her family or had been dishonest for not revealing the presence of a felon in her family when, during the previous voir dire, she clearly indicated that there was a felon in her family. The fact that Mosley did not reveal the existence of a felon in her family provides an additional reason, namely Mosley's dishonesty, in support of the strike. Similarly, Darrel Allen was peremptorily struck for having a brother in his family who had been imprisoned for several years for a drug crime. Additionally, the State argued that Allen lived in the area of the crime. The fact that Allen lived in the area of the crime, combined with the existence of a felon in his family, distinguishes Allen from the white juror who merely had a felon in his family but who did not live in the area of the crime. Therefore, the State provided additional reasons for each of the African American jurors struck that distinguished them from the white juror to whom they were compared.

¶15. It must also be mentioned that the trial judge accepted the State's reasons only after Aguilar made no

attempt at rebuttal. The fact that the State did not attempt to strike the white juror, who admitted having a family member who had been convicted of a felony, should have been argued by Aguilar in making out his prima facie case as well as in rebuttal. *See Sewell v. State,* 721 So. 2d 129, 136 (¶36) (Miss. 1998) (noting that strength of reasons supporting prima facie case of discrimination will influence judge's inquiry under prong three). Nonetheless, both Mosley and Allen were struck for factors additional to the existence of a felon in their families. Therefore, the trial judge did not err in finding that Aguilar failed to carry his burden of proving purposeful discrimination.

## II. DID THE TRIAL COURT ERR IN FAILING TO RULE THAT AGUILAR'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL?

¶16. Aguilar argues that he should be granted a new trial because his original trial counsel was ineffective. Aguilar, with new appellate counsel, raises this issue for the first time here.

¶17. It is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. This is because we are limited to the trial court record in our review of the claim and there is usually insufficient evidence within the record to evaluate the claim. *See Edwards v. State,* 797 So. 2d 1049, 1060 (¶30) (Miss. Ct. App. 2001). The Mississippi Supreme Court has stated that, where the record cannot support an ineffective assistance of counsel claim on direct appeal, the appropriate conclusion is to deny relief, preserving the defendant's right to argue the same issue through a petition for post-conviction relief. *Read v. State,* 430 So. 2d 832, 837 (Miss. 1983). This Court will rule on the merits on the rare occasions where "(1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge." *Colenburg v. State,* 735 So. 2d 1099, 1101 (¶5) (Miss. Ct. App. 1999). Because a majority of Aguilar's claims for ineffective assistance are based on mere assertions pertaining to evidence not found within the record, we will not address them on direct appeal.

## III. WAS THE JURY'S VERDICT CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE?

¶18. When reviewing a trial court's denial of a motion for a directed verdict or JNOV, this Court considers "the sufficiency of the evidence as a matter of law . . . in a light most favorable to the State." *McClain v. State,* 625 So. 2d 774, 778 (Miss. 1993). We will accept any credible evidence that supports guilt as true, granting the prosecution "the benefit of all favorable inferences that may reasonably be drawn from the evidence." *Wetz v. State,* 503 So. 2d 803, 808 (Miss. 1987). This Court will only reverse where "no reasonable, hypothetical juror could find beyond a reasonable doubt that the defendant was guilty." *May v. State,* 460 So.2d 778, 781 (Miss. 1984).

¶19. Similarly, the weight of the evidence is reviewed in following the trial court's denial of a defendant's motion for a new trial. It is well established that new trial decisions rest within the discretion of the trial court. *McClain,* 625 So. 2d at 781. This Court is obligated to accept all evidence supporting the verdict as true and will reverse only where it is clear that the trial court has abused its discretion by refusing a new trial. *Herring v. State,* 691 So.2d 948, 957 (Miss. 1997). "The proper function of the jury is to decide the outcome in this type of case, and the trial court should not substitute its own view of the evidence for that of the jury's." *Smothers v. State,* 756 So. 2d 779, 786 (¶21) (Miss. Ct. App. 1999). Ultimately, a motion for a new trial should only be granted when the verdict is so contrary to the overwhelming weight of the

evidence that, to allow it to stand, would be to sanction an unconscionable justice. *Wetz,* 503 So.2d at 812.

¶20. After reviewing all of the evidence in a light most consistent with the guilty verdict, this Court finds that the trial judge neither abused his discretion in denying Aguilar's motion for a JNOV nor in denying his motion for a new trial. As the record reflects, the testimony elicited from the various witnesses during the trial often conflicted; however, the State presented enough evidence, both physical and testimonial, to support the conviction. There was never any dispute as to who stabbed Bo; Aguilar's sole defense was that his actions were necessary to defend his life as well as that of Tammy's. However, Aguilar's defense was weakened when Tammy testified that she was never in fear for her life. Additionally, Tammy indicated that the danger posed by Bo was not eminent and testified that Aguilar had no reason to use the knife. Likewise, Aguilar told the police that he picked up the knife well before his encounter with Bo and intended to use it, not in self-defense, but as a means for scaring Bo. Tammy also made clear during her testimony that she had specifically told Aguilar prior to this occasion that he was forbidden to come to her home. Although Tammy's testimony was inconsistent at times, it was up to the jury, not the court, to resolve the inconsistencies. *See Collier v. State,* 711 So. 2d 458, 462 (¶18) (Miss. 1998) (noting that inconsistencies and contradiction in testimony of witness should be resolved by the jury); *Benson v. State,* 551 So. 2d 188, 193 (Miss. 1989); *Groseclose v. State,* 440 So. 2d 297, 301-02 (Miss. 1983); *Nash v. State,* 278 So. 2d 779, 780 (Miss. 1973). As such, this issue is without merit.

## IV. DID THE TRIAL COURT ERR BY REFUSING TO ADMIT EVIDENCE PERTAINING TO SPECIFIC BAD ACTS OF THE DECEASED VICTIM?

¶21. Aguilar contends that the trial court committed reversible error in denying his right to confrontation by not admitting evidence of Bo Hudson's history of violence. According to Aguilar, the only contested issue was his *mens rea* at the time of the stabbing; therefore, Aguilar argues that the evidence was crucial to his claim of self-defense as it was necessary to show that Bo was dangerous and had a history of abusing Tammy. We first note that Aguilar made no attempt to show that he had preexisting firsthand knowledge of Bo's violent propensities. *See Freeman v. State,* 204 So. 2d 842, 844 (Miss. 1967) (noting that evidence of victim's violent propensity generally not admissible unless defendant had preexisting knowledge of the propensity). Regardless, where there is an issue concerning who the first aggressor was, this Court recognizes an exception to the general rule requiring first hand knowledge and evidence of the victim's violent propensities may be admitted. *Id.* at 844; *Swindle v. State,* 755 So. 2d 1158, 1170 (¶38) (Miss. Ct. App. 1999).

¶22. While the trial judge could have admitted this evidence, his failure to do so did not prejudice Aguilar's defense. *See Jackson v. State,* 594 So. 2d 20, 25 (Miss. 1992) (noting that "the admission or exclusion of evidence must result in prejudice or harm, if a cause is to be reversed on that account"). The record reflects that evidence of Bo's violent nature was placed before the jury on several different occasions. For instance, on direct examination, Tammy stated that she tried to keep Bo from coming down to the house because he had a temper; Tammy asserted that she feared that there would be "a problem" if Bo and Joshua were at the house at the same time. Likewise, Tammy admitted that she and Bo "had a history" prior to this incident and testified that she knew what would happen if she had accompanied Bo outside, implying Bo's aggressive nature almost ensured that a physical confrontation would have resulted. Additionally, Tammy testified that Bo had kicked her door and broken it the week before the crime and the State chose to allow this evidence without asking the judge to admonish the jury or that a limiting instruction be issued; therefore, the jury was presented specific evidence of Bo's past, aggressive behavior. If there were any other specific

instances of Bo's aggression that Aguilar desired to place before the jury, as he now claims on appeal, he failed to make any offer of proof; therefore, we will not hold the trial judge in error for the failure to admit evidence of specific acts that were never presented to him for decision. *See Cook v. State,* 728 So. 2d 117, 120 (¶4) (Miss. Ct. App. 1998). Given that the jury was presented with evidence of Bo's violent demeanor throughout the trial, and that Aguilar failed to make an offer of proof as to any specific acts other than those mentioned during trial, we find Aguilar's argument to be meritless.

¶23. This Court also takes note of the fact that when asked by the trial court to state his reasons for introducing the evidence, Aguilar replied that the evidence was intended to impeach Tammy's earlier testimony that she was never in any danger during the duration of the altercation. This reasoning is notably different from that now argued on appeal; as such, Aguilar's argument is procedurally barred. *See Holland v. State,* 587 So. 2d 848, 868 n. 18 (Miss. 1991) (noting that defendant was barred from making an argument where the basis of the argument was different from that raised before the trial court).

¶24. **THE JUDGMENT OF THE CIRCUIT COURT OF LAUDERDALE COUNTY OF CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE IS AFFIRMED. SAID SENTENCE TO RUN CONSECUTIVELY TO ANY PREVIOUS SENTENCE. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAUDERDALE COUNTY.**

**McMILLIN, C.J., SOUTHWICK, P.J., BRIDGES, THOMAS, LEE, MYERS AND BRANTLEY, JJ., CONCUR. KING, P.J., CONCURS IN RESULT ONLY. IRVING, J., NOT PARTICIPATING.**