# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-KA-01573-SCT

*JAMES MICHAEL STRICKLAND*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/31/2006 |
| TRIAL JUDGE: | HON. LEE J. HOWARD |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | MOSE LEE SUDDUTH, JR. |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: DEIRDRE McCRORY |
| DISTRICT ATTORNEY: | FORREST ALLGOOD |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/06/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.    James Michael Strickland ("Strickland") was arrested in Lowndes County, Mississippi, and charged with armed robbery of the Penny Ridge Grocery in Columbus, Mississippi. In the Circuit Court of Lowndes County, Strickland was found guilty by a jury. The jury, however, could not "unanimously agree on the proper punishment." Since the jury was unable to agree unanimously on the sentence of life imprisonment, the trial judge was statutorily mandated to sentence Strickland to imprisonment for "any term not less than three years." *See* Miss. Code Ann. § 97-3-79 (Rev. 2006). Pursuant to statute, the trial judge sentenced Strickland to serve a term of thirty years in the custody of the Mississippi

Department of Corrections ("MDOC"). Upon finding Strickland to be a habitual offender pursuant to Mississippi Code Annotated Section 99-19-81, the trial judge directed that Strickland's thirty-year sentence be served without the benefit of parole or probation. Strickland's "Motion for a Judgment Notwithstanding the Verdict or, in the alternative, a New Trial" was subsequently overruled by the circuit court. He then timely filed notice of appeal.

**FACTS**

¶2. On May 10, 2000, Strickland, Jonathan Burnett, Nellie Harrell, Brandy Todd, and Christopher Harris visited the home of Strickland's brother, George Strickland ("George"). As the group was leaving, Strickland testified that George gave Burnett "a pistol that belonged to [Burnett's] cousin to give back to him." Strickland added that the gun was definitely not loaded as "[George] took the bullets out of the gun when he handed it to [Burnett]." Thereafter, as the group was riding in Harris's Ford Focus, Strickland testified that:

> [Harrell] started hollering that she wanted bottled beer. . . . [T]he first store we come to was the Soco. When we got up to it, there was a police officer sitting there. So [Harris] kind of panicked, kept going straight, just made the first turn.[1] And we come up to the stop sign, and the door [to Penny Ridge Grocery] was open. The lady was coming out, and . . . she said they sell beer right there . . . .

---

[1]According to Strickland, the group was not planning to rob the Soco but left because "there's five people in the car with the window knocked out . . . that are all drinking. [Harris] panicked."

2

¶3.    Amy Wright was the store clerk at the Penny Ridge Grocery.  According to Wright,

a "little silver car" with five occupants (three men and two women) arrived at the store just

before dusk and:

> a young lady gets out in a green bikini top and asked me were we closed and
> I told her we closed at 8:00 [p.m.].  And she said, well, we're just in time.  And
> I proceeded to go in the store, and two gentlemen come into the store and go
> to the beer cooler.

Wright testified that the two individuals[2] remained at the beer cooler for approximately five

minutes.  During that period, Wright "commented to [Strickland and Burnett that] your ride

just left, and they said they didn't care."[3]  Thereafter, according to Wright, Strickland and

Burnett:

> got two six-packs of Bud Light beer in the bottle and started to approach the
> front of the register.  And [Burnett] passed money to [Strickland].  And at that
> point knowing that he didn't look old enough to buy beer and should not have
> given money to another gentleman to purchase it, I asked both gentlemen for
> ID.

Wright testified that when she requested identification, Strickland "came behind the counter

. . . and got my . . . personal purse. . . .  And he took my personal purse and told me he

guessed that I would give them the beer now."[4]  When Wright began to struggle with

Strickland for her purse, Burnett reached across the counter, slapped her face, and pulled a

---

[2]Wright made an in-court identification of Strickland as one of the men and described the other man, later identified as Burnett as being " very, very young.  Teenager in fact.  This was my opinion."

[3]According to Strickland, Harris had merely moved the vehicle "[j]ust right to the side where they could use the bathroom."

[4]Strickland testified he did not have any identification with him at the time and that he "asked to see [Wright's] ID when she was asking to see mine.  And I grabbed her purse and put it up there, and I said, I guess you'll sell us the beer now, right?"

3

gun on her.[5]  According to Wright, the gun "was small, silver in color.  I was so close to it that I could see that it had a cylinder with bullets in it, and I could see the two bullets on either side."  While pointing the gun at Wright, Burnett attempted to open the cash register by striking it.  Wright testified that Strickland repeatedly directed Burnett in an "[i]rritated, angry" tone of voice to "just shoot the bitch."  By contrast, Strickland testified that "I never told [Burnett] to shoot [Wright] because there was no bullets in the gun was the main reason.  Another one is because I wouldn't have been wanting to see him shoot nobody anyway with five people . . . ."[6]  Wright was "begging [Burnett] not to shoot me and begging [Strickland] to give me my purse back."  Burnett then threw the cash register on the floor and the cash box separated from the control console.  When the cash-box portion remained closed, Strickland instructed Burnett to "*take it with us*."  (Emphasis added).  Strickland and Burnett then ran out of the store with one six-pack of beer, the cash-box portion of the cash register,[7] and Wright's purse.[8]  Wright immediately called 911 and told the dispatcher that the perpetrators were driving a silver vehicle.

---

[5]According to Strickland, "I didn't know that he had the gun on his person.  I thought it was in the car.  I had no idea he was going to do that."

[6]Strickland admitted that when Burnett initially pulled the gun he did not tell him to put it away.  Thereafter, however, he insisted that "I told him to just put it away . . . .  And he was slamming the cash register. . . . [The gun] was already back wherever it come from when he was slamming the cash register."

[7]According to Wright, "[a] little over $900" was contained therein.

[8]According to Wright, her purse contained "[a]ll of my identification, my wallet, my cigarettes, a picture of my family that I had been going to mail off.  I believe there were some bills in there, some mail that I had collected, a hair brush, a camera."

¶4.     At approximately 7:45 p.m., Officer Donnie Elkin of the Columbus Police Department received a dispatch regarding an armed robbery at Penny Ridge Grocery. Two to three minutes later, Elkin testified that he "passed a smaller silver car that was traveling at a pretty good rate of speed and had several occupants. And that's when I turned around just to check and see if it was the vehicle." Just after Elkin turned his blue lights on, he observed a cash register thrown from the driver's side window.[9] According to Elkin:

> [w]hen I noticed that they were not going to yield for my blue lights, I immediately hit my sirens and advised my other units that they were not yielding. We continued driving toward Alabama on Highway 12. . . . We got to about Jess Lyons Road and I had passed the vehicle to slow them down because we were traveling at a pretty good rate of speed [approximately 60-70 miles per hour].

At Jess Lyons Road, the Ford Focus turned left, and Elkin turned around, continuing pursuit. Thereafter, the vehicle turned left again and headed back toward Columbus at approximately eighty to ninety miles per hour. Elkin testified that, while in pursuit, the driver took:

> any lane he could find to try to get through . . . down the turn lane. We were driving on the wrong side of the road. When we got to about Cooper Auto Sales . . . someone threw an object out of the window. . . . Once again, I called it in . . . that they had thrown something out the window. . . . [A]nother officer went to that area trying to locate what they had thrown while we still continued the pursuit.[10]

As the vehicle continued toward Columbus, the police placed spikes in the road which stopped the vehicle by puncturing the left front tire of Harris's Ford Focus. Five individuals

---

[9]Strickland testified that he threw the cash-box portion of the cash register out of the window. Over his radio, Elkin instructed other units to secure the cash register. Minutes later, Officer Rhonda Sanders of the Columbus Police Department found the bottom of the cash register just off the road.

[10]Strickland testified that Burnett threw the pistol holster out of the window.

were in the vehicle: Strickland, Burnett, Harrell, Todd, and the driver, Harris. Deputy Sheriff Kevin Petrie of the Lowndes County Sheriff's Department later processed the vehicle for evidence and found a six-pack of bottled Bud Light beer, an envelope addressed to Wright, a water bill addressed to Wright's husband, and a photograph of Wright's family.[11]

¶5.　On August 18, 2000, Strickland was indicted under Mississippi Code Annotated Section 97-3-79 for armed robbery. At his arraignment, Strickland pleaded not guilty, and bond was set at $50,000.[12] On December 1, 2000, the circuit court entered a "Judgment Nisi," stating:

> [t]his cause came on this day for Trial and the defendant [Strickland] being called three times in open Court, came not, judgment is therefore given against him/her and Robert Earl Smith, Surety, on his/her Appearance Bond for $50,000.00 to be made final unless they show cause against it according to law; and the Circuit Clerk is Ordered to issue Scire Facias to [Strickland], Principal and Robert Earl Smith, Surety, and returnable on March 1, 2001.
>
> The aforesaid bond is hereby revoked and a new bond in the amount of None is set herein.

That same day, a "Bench Warrant" for Strickland was issued by the circuit court. On November 14, 2001, "Final Judgment" was entered by the circuit court, stating:

> [t]his cause came on for hearing and [Strickland] being called came not, and it appearing to the Court that a Judgment Nisi was entered in this cause on December 1, 2000, and scire facias having been issued to [Strickland] Principal, and Robert Earl Smith, Surety on his/her bond, on the December 1, 2000, and served on Robert Earl Smith on December 6, 2000 commanding him

---

[11]Strickland denied that any contents from the discarded purse were kept intentionally. Additionally, Petrie found approximately twenty-five beer cans.

[12]Strickland admitted at trial that in his initial statements to the Lowndes County Sheriff's Department, he fabricated a story about "black[ing] out" before entering the store and not recalling any events which followed, all for the purpose of "trying to get a bond . . . ."

to have [Strickland] at the Next Term of this Court, and [Strickland] appearing not, when called at this term, judgment is hereby made final against [Strickland], Principal, and Robert Earl Smith Surety on his/her Appearance Bond for $50,000.00, and all cost of court incurred herein.

On February 13, 2002, the circuit court entered an "Order Removing Case Pending Apprehension of Defendant." In March 2003, Strickland was arrested in Madison, Florida, on a felony warrant from Lowndes County.[13] On June 13, 2003, the circuit court "[o]rdered that the Final Judgment previously entered on the bond of [Strickland] and Robert Earl Smith, surety, be set aside."

¶6. On August 24, 2006, the State filed a "Motion to Amend Indictment" to reflect the habitual offender status of Strickland pursuant to Mississippi Code Annotated Section 99-19-81, and on August 25, 2006, the State filed a "Motion for Bifurcated Sentencing Hearing." On August 28, 2006, the jury trial commenced.[14] The following day, the jury found Strickland guilty as charged of armed robbery. The jury, however, could not "unanimously agree on the proper punishment[,]" specifically, whether Strickland should be sentenced to life imprisonment. The circuit court then sentenced Strickland to serve a term of thirty years,[15] after granting the State's motion to amend the indictment and have Strickland declared a habitual offender.[16]

---

[13]The "Bench Warrant" was formally executed on March 19, 2003.

[14]The circuit court deferred ruling on the State's "Motion for Bifurcated Sentencing Hearing" pending a jury resolution of Strickland's guilt.

[15]The order of the circuit court added that "[t]his sentence shall not be reduced or suspended nor shall [Strickland] be eligible for parole or probation."

[16]The indictment was amended to include the following language:

7

**ISSUES**

¶7.     Strickland raises the following issues:

(1) Whether the circuit court erred in allowing the State to strike African-American jurors off the venire panel.

(2) Whether the circuit court erred in allowing Strickland's prior conviction for theft of property to be used by the State for impeachment purposes.

(3) Whether Instruction D-2 was properly refused by the circuit court.

**ANALYSIS**

**I.     Whether the circuit court erred in allowing the State to strike African-American jurors off the venire panel.**

¶8.     The State exercised eleven, and Strickland exercised eight, peremptory challenges in selecting the twelve jurors and one alternate. The record reveals that seven of the State's peremptory challenges were exercised on African-Americans. Strickland's counsel then stated that "[w]e're probably going to have to do a ***Batson***[17]." The State responded by voluntarily offering to provide race-neutral reasons. The trial judge opined none were required, as Strickland made no motion. Strickland then moved *ore tenus* for a ***Batson***

---

And further that [Strickland] was previously convicted on February 22, 1988, in the Circuit Court of Jefferson County, Alabama . . . of Theft of Property - 2nd, a felony, and sentenced to serve a term of two (2) years in the Alabama Department of Corrections [("ADOC")].

And further that [Strickland] was previously convicted on January 14, 1991, in the Circuit Court of Jefferson County, Alabama . . . of Escape - 2nd, a felony, and sentenced to serve a term of twelve (12) years in the [ADOC].

And further that [Strickland] was previously convicted on March 5, 1993, in the Circuit Court of Jefferson County, Alabama . . . of Theft of Property - 2nd, a felony, and sentenced to serve a term of fifteen (15) years in the [ADOC].

[17]*See* ***Batson v. Kentucky***, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

hearing on six jurors. At that point, the court offered Strickland an opportunity to make a prima facie showing of discriminatory intent to comply with **Batson**. Strickland offered no evidence other than the number of African-Americans struck. Strickland freely acknowledged that he was Caucasian and that no racial issues were involved in the case. Considering the totality of relevant facts before the court, the trial judge found that Strickland failed to make "a prima facie case that the State has exercised its peremptory challenges in a racial manner to exclude members of any particular class."

¶9. Strickland argues that the circuit court committed reversible error in failing "to follow the proper procedures to insure the State was fairly presenting 'race-neutral' reasons for striking the . . . jurors." The State responds that:

> the essence of [Strickland's] argument is that the court erred in failing to require the [S]tate to articulate racially neutral reasons for its strikes against black veniremen. This point begs the question inasmuch [as] it is the establishment of a *prima facie* case which triggers the requirement of such articulation.

As such, the State counters that "Strickland has plainly failed to sustain his burden of showing that the trial court's ruling on this issue was against the overwhelming weight of the evidence or clearly erroneous."

¶10. Criminal defendants "have the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria." **Batson**, 476 U.S. at 85-86. However:

> [t]he **Batson** doctrine is not concerned with racial, gender, or ethnic *balance* on petit juries, and it does not hold that a party is *entitled* to a jury composed of or including members of [a] cognizable group. Rather, it is concerned exclusively with *discriminatory intent* on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

9

***Ryals v. State***, 794 So. 2d 161, 164 (Miss. 2001).  In meeting "the *evidentiary burden* placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges[,]" ***Batson***, 476 U.S. at 82 (emphasis added), this Court has noted that:

> 1.  The party objecting to the peremptory challenge *must first make a prima facie showing that race was the criteria for the exercise of the peremptory challenge*.
>
> 2.  *If this initial showing is successful*, the party desiring to exercise the challenge has the burden to offer a *race-neutral explanation* for striking the potential juror.
>
> 3.  The trial court must then determine whether the objecting party has met their burden to prove there has been purposeful discrimination in the exercise of peremptory challenges.[18]

***Carter v. State***, 799 So. 2d 40, 46 (Miss. 2001) (quoting ***Stewart v. State***, 662 So. 2d 552, 557-58 (Miss. 1995)) (emphasis added).  *See also* ***Batson***, 476 U.S. at 93-94 (a criminal defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.").  To establish the prima facie case, this Court has stated that "a white defendant[19] must show that the prosecutor has used peremptory challenges on persons of race and that the [*facts and*] *circumstances* give rise to the inference that the prosecutor used the peremptory challenges

---

[18]The circuit court must "make an on-the-record, factual determination, of the merits of the reasons cited by the State for its use of peremptory challenges against potential jurors." ***Hatten v. State***, 628 So. 2d 294, 298 (Miss. 1993).

[19]Following the United States Supreme Court's decision in ***Powers v. Ohio***, 499 U.S. 400, 402, 173 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), "a white defendant . . . has standing to object to the use of peremptory challenges on potential black jurors." ***Bush***, 585 So. 2d at 1267.

in order to strike minorities." ***Bush v. State***, 585 So. 2d 1262, 1267-68 (Miss. 1991) (emphasis added). *See also **Ryals***, 794 So. 2d at 166 (the "*totality of the relevant facts*" is to be considered in determining whether the inference of discriminatory purpose exists) (emphasis added); ***Batson***, 476 U.S. at 93 ("[a]s in any equal protection case, the 'burden is, of course,' on the defendant who alleges discriminatory selection of the venire 'to prove the existence of purposeful discrimination.' In deciding if the defendant has carried his burden of persuasion, a court must undertake 'a sensitive inquiry into such *circumstantial and direct evidence* of intent as may be available.'") (citations omitted) (emphasis added).

¶11.    Regarding the review of ***Batson*** determinations, this Court has stated that:

> [a] reversal will only occur if the factual findings of the trial judge appear to be "*clearly erroneous or against the overwhelming weight of the evidence.*" ***Tanner*** [*v. State*], 764 So. 2d 385, 393 (Miss. 2000) . . . . "On appellate review, the trial court's determinations under ***Batson*** . . . are accorded *great deference* because they are based, in a large part, on credibility." ***Coleman v. State***, 697 So. 2d 777, 785 (Miss. 1997) . . . . The term "great deference" has been defined in the ***Batson*** context as meaning an insulation from appellate reversal any trial findings which are not *clearly erroneous*. ***Lockett v. State***, 517 So. 2d [1346,] 1349 (Miss. 1987).

***Smith v. State***, 835 So. 2d 927, 940 (Miss. 2002) (emphasis added). This deferential standard of review reflects "confidence that trial judges experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." ***Batson***, 476 U.S. at 97.

¶12.    The circuit court found that no prima facie case giving rise to an inference of purposeful discrimination was established. This Court has scoured the record and has found no evidence indicating that the circuit court's finding was "clearly erroneous or against the

11

overwhelming weight of the evidence." **Smith**, 835 So. 2d at 940 (quoting **Tanner**, 764 So.

2d at 393). The appellate record is devoid of facts revealing the racial composition of either

the venire or the ultimately empaneled jury.[20] The lone "circumstanc[e] giv[ing] rise to the

inference that the prosecutor used the peremptory challenges in order to strike minorities[,]"

**Bush**, 585 So. 2d at 1268, was that a larger number of African-Americans, compared to

Caucasians, were peremptorily stricken by the State. However, this record does not reveal

whether that number was disproportionate to the racial composition of the venire. "[T]hough

the sheer number of strikes exercised against a cognizable group of jurors is not itself

dispositive of our analysis, 'the relative strength of the prima facie case of purposeful

discrimination will often influence this inquiry' into **Batson** challenges." **Flowers v. State**,

---

[20]Thus distinguishing the case *sub judice* from **Chisolm v. State**, 529 So. 2d 630 (Miss. 1988) and **Walker v. State**, 740 So. 2d 873, 880 (Miss. 1999). In **Chisolm**, this Court deferred to the trial court's determination that a prima facie showing of purposeful discrimination existed where the appellate record included the number of African-Americans on the empaneled jury. Specifically:

> that Chisolm is a black person and that the jury seated for his trial – including one alternate juror – was composed of ten white persons and three black persons. The record further reflects that the prosecution exercised twelve peremptory challenges, seven of which were used to exclude black persons from the jury.

*Id*. at 632. Ultimately, however, this Court affirmed the trial court's holding "that the prosecuting attorney had successfully rebutted Chisolm's prima facie showing." *Id*. at 633. In **Walker**, this Court determined that the trial court erred in finding no prima facie case of purposeful racial discrimination existed where the appellate record revealed that "the State used seven out of nine peremptory challenges to exclude black persons. *The final jury resulted in ten whites and two blacks . . . ."* **Walker**, 740 So. 2d at 880 (emphasis added). Moreover, any reliance by the dissent on **Thorson v. State**, 653 So. 2d 876 (Miss. 1994), is misplaced as the appellate record in that case included the number of African-Americans on the venire, and the dispositive issue pertained to the applicability of **Powers**. *See id*. at 895-96.

947 So. 2d 910, 935 (Miss. 2007) (quoting *Sewell v. State*, 721 So. 2d 129, 136 (Miss. 1998)).[21]  However, in *Ryals*, this Court held that:

> [t]he "totality of the relevant facts" do not give an inference of discriminatory purpose.  The trial judge was shown a single factor, that the State exercised 10 of its 12 peremptory strikes against women, to support an inference of discriminatory intent.  This factor, in itself, under the facts of this case, was not compelling proof of discriminatory intent, given that women composed one-half, rather than a minority, of the venire, and given that the State tendered three women.  Opposed to this one factor were the factors that nothing about the voir dire, nothing about the prosecutors' conduct, nothing about the habitual policies of these prosecutors or any stated policies of the district attorney's office, and nothing about the nature of the case support an inference of discriminatory intent.

*Ryals*, 794 So. 2d at 166.  Similarly, this Court finds that exercising seven peremptory strikes against African-Americans, standing alone, absent any other facts or circumstances related to (1) racial composition of the venire, empaneled jury, or community, or other non-exclusive factors such as (2) the prosecutor's conduct, (3) the habitual policies of these prosecutors, (4)

---

[21]While not dispositive, the greater the number of strikes exercised against a cognizable racial group of jurors, the greater "the relative strength of the prima facie case of purposeful discrimination . . . ."  *Flowers*, 947 So. 2d at 935 (quoting *Sewell*, 721 So. 2d at 136).  In *Flowers*, however:

> [o]f the six hundred summonses sent out to potential jurors . . . three hundred questionnaires were filled out by potential jurors and received by the court in response to the summonses.  At least 120 potential jurors indicated that they were of African-American descent, meaning that at least forty percent of the potential jury pool was African-American.  This percentage closely tracks the racial demographics of Montgomery County, as defense counsel asserted that African-American citizens comprise forty-five percent of the county's population.  The prosecutor exercised all fifteen of his peremptory strikes on African-Americans, and the lone African-American who ultimately sat on Flowers' jury was seated after the State ran out of peremptory challenges.

*Id*. at 936.  The totality of circumstances presented in *Flowers*, when considered in tandem, distinguishes it from the case *sub judice*.

the stated policies of the district attorney's office, or (5) the nature of the case itself, *see id.*, fails to establish "a prima facie showing that race was the criteria for the exercise of the peremptory challenge." *Carter*, 799 So. 2d at 46. As no evidence was offered to the trial court to support Strickland's claim of a *Batson* violation, this Court cannot conclude that the circuit court clearly erred in denying Strickland's request for a *Batson* hearing.

¶13. The dissent advances the proposition that this Court should rule in a factual vacuum, by elevating an inference of equivocal value to be the substantial equivalent of a prima facie case, without requiring Strickland to provide facts or circumstances to support his argument. This Court finds that such a holding would eradicate the requisite "*evidentiary burden* placed on a criminal defendant who claims that he has been denied equal protection through the State's use of peremptory challenges[.]" *Batson*, 476 U.S. at 82. In the case *sub judice*, a prima facie case requires Strickland to produce sufficient evidence to permit the trial judge to infer purposeful discrimination. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, n. 7, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207, 216 (1981) ("[t]he phrase 'prima facie case' . . . may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue."). The exercise of seven peremptory strikes on African-Americans, standing alone, is insufficient for this Court to infer the fact at issue, i.e., purposeful discrimination. Moreover, it requires that this Court ignore the circuit court's determination and the great deference to which it is entitled. *See Smith*, 835 So. 2d at 940; *Batson*, 476 U.S. at 97. We find insufficient evidence in the record to conclude the trial court's ruling was against the overwhelming weight of the evidence or clearly erroneous and, therefore, affirm the trial court as to this issue. Our ruling

14

today does not alter or change the threshold for a party to establish a prima facie case of purposeful discrimination; it only requires that the party put forth sufficient facts or circumstances to meet the threshold itself.

> **II.** **Whether the circuit court erred in allowing Strickland's prior conviction for theft of property to be used by the State for impeachment purposes.**

¶14.   With the jury out, the State "request[ed] a hearing under Rule 609 of Mississippi Rules of Evidence, ***Peterson v. State*** [518 So. 2d 632 (Miss. 1987)]. The State intends to, with the Court's permission, use [Strickland's] prior felony convictions to attack his credibility as a witness should he elect to testify." The State then tendered certified copies of Strickland's three prior felony convictions in the Circuit Court of Jefferson County, Alabama.[22] Strickland objected, arguing that "[a]ll three of those are over ten years . . . ."

¶15.   The State conceded that CC-87-003681-00 was outside the ten-year period and inadmissible. While admitting that CC-90-003838-00 was also outside the ten-year period, the State maintained that:

---

[22]On February 22, 1988, in cause number CC-87-003681-00, Strickland entered a guilty plea to felony Theft of Property - 2nd, and was sentenced to serve a term of two years in the custody of the ADOC. On January 14, 1991, in cause number CC-90-003838-00, Strickland entered a guilty plea to felony Escape - 2nd, and was sentenced to serve a term of twelve years in the custody of the ADOC. That sentence, however, was to be served as a "'split sentence' in that [Strickland] shall serve 30 days in the penitentiary, thereafter shall be released and remain on probation for 3 years." Finally, on March 5, 1993, in cause number CC-92-003257-00, Strickland entered a guilty plea to felony Theft of Property - 2nd, and was sentenced to serve a term of fifteen years in the custody of the ADOC. However, that sentence also provided for being served as a "split sentence" with "1 yea[r] to actually serve in a jail type institution . . . the execution of the remainder of said sentence is suspended pending [Strickland's] good behavior on probation for 5 years."

this crime happened in May of 2000. [Strickland] was set for trial in November of 2000, which he ended up not reporting on his bond. There was a Judgment Nisi taken. But for his flight, the State would have been able to bring this case to trial [at] a time in which the time period would not have elapsed. . . .

[Strickland's] refusal to show up for [c]ourt and failure to appear as required by the terms and conditions of his bond is the reason that we are trying this case outside the initial term of ten years.

As to CC-92-003257-00, the State argued that "I think that the way the rule reads, the confinement imposed for that conviction of 15 years, [Strickland] is still under that confinement even today as we sit."[23] Additionally, the State maintained that credibility is directly at issue because "it's going to be a believability contest should [Strickland] elect to testify between [him] and [Wright]." As such, the State asserted that "when the *Peterson* factors are weighed, the probative value of allowing this particular conviction[24] in outweighs any prejudicial effect [on Strickland]."

¶16.   The circuit court deemed only Strickland's conviction in CC-92-003257-00 to be admissible, finding:

[w]e have not gotten to . . . 2008. . . . This is within the 15-year period. I am going by what the judge says his sentence was. The judgment was a split sentence to a term of 15 years. One year to serve, the execution of the remainder was suspended pending [Strickland's] good behavior on probation for five. . . . Even after the probation expires, the judge still has the authority to revoke the suspension. That is the law in this state.

The circuit court then declared that:

I have . . . gone over the *Peterson* factors; that is, the impeachment value of the prior crime, the point in time between the conviction and his subsequent

---

[23]Counsel for Strickland responded that "[a]fter five years, he's no longer under that sentence."

[24]The subject property was seven twelve-packs of beer.

16

history, the similarity between the past crime and the charged crime, the importance of his testimony, and the centrality of the credibility issue. I find that all of these factors weigh in favor of allowing impeachment with this particular crime [CC-92-003257-00] and not the other two . . . .

Furthermore, the circuit court found this prior conviction to be "relevant and will not be excluded because I do find that the probative value is not substantially outweighed by the danger of unfair prejudice."

¶17. Strickland argues that "[t]he lower court based it[s] decision to allow the conviction in on the sentence, not the conviction date or the release from confinement, which was only a year." Regarding the *Peterson* factors, Strickland insists that his prior conviction for theft "has little, if any, impeachment value[,]" as to the crime of armed robbery; this prior conviction "occurred over 13 years prior to the trial in the instant case[;]" Strickland was the only defense witness and, therefore, "[t]he importance of [his] testimony weighs against the admissibility of the conviction[;]" and "since theft is not a crime of dishonesty, it has no reflection on his credibility." As such, Strickland maintains that "the lower court[′s] evaluation process of the five *Peterson* factors to the facts of the instant case were in error" and, furthermore, that the prejudicial effect of admitting this prior conviction outweighed its probative value. The State replies that "Strickland has failed to show that the trial court abused its discretion in admitting this conviction."

¶18. The circuit court's decision to admit the prior conviction for impeachment is reviewed under an abuse-of-discretion standard. *See Henderson v. State*, 641 So. 2d 1184, 1186 (Miss. 1994). Mississippi Rule of Evidence 609 states, in pertinent part, that:

(a) **General Rule**. For the purpose of attacking the credibility of a witness,

(1) evidence that (A) a nonparty witness has been convicted of a crime shall be admitted subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and (B) a party has been convicted of such a crime *shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect* to the party; and

(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of punishment.

(b) **Time Limit**.  Evidence of a conviction under this rule is *not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect.*

Miss. R. Evid. 609(a) and (b) (emphasis added).  Theft crimes are categorized under Mississippi Rule of Evidence 609(a)(1). *See Blackman v. State*, 659 So. 2d 583, 585 (Miss. 1995).  "[C]onvictions offered under 609(a)(1) to impeach a party must be analyzed under the guidelines set forth in *Peterson* . . . to determine if the probative value is great enough to overcome the presumed prejudicial effect to that party, and findings should be made on the record by the judge."  Miss. R. Evid. 609 cmt.  The *Peterson* factors include:

(1) The impeachment value of the prior crime.

(2) The point in time of the conviction and the witness' subsequent history.

(3) The similarity between the past crime and the charged crime.

(4) The importance of the defendant's testimony.

(5) The centrality of the credibility issue.

*Peterson*, 518 So. 2d at 636.

18

¶19. The circuit court addressed the fifteen-year "split sentence" in CC-92-003257-00 for purposes of Mississippi Rule of Evidence 609(b), and correctly noted that a suspended sentence may be revoked by the circuit court. *See **Johnson v. State***, 925 So. 2d 86, 93 (Miss. 2006) (quoting ***Carter v. State***, 754 So. 2d 1207, 1210-11 (Miss. 2000) (Mills, J., dissenting)). However, Mississippi Rule of Evidence 609(b) provides that evidence of a conviction under Rule 609(a) "is not admissible if a period of more than ten years has elapsed since *the date of the conviction or of the release of the witness from the confinement imposed for that conviction*, whichever is the later date . . . ." Miss. R. Evid. 609(b) (emphasis added). The date of conviction in CC-92-003257-00 is certain, i.e., March 5, 1993. However, release of the witness from confinement is indeterminable from the record before us. The "date of the conviction" is outside the ten-year period, but we are uncertain as to the date "of release of the witness from the confinement imposed[,]" and whether that date is greater or less than ten years from the date of trial, August 28, 2006.

¶20. However, that issue is not outcome-determinative, as Rule 609(b) establishes an exception to the ten-year time limit if "the court determines, in the interests of justice, that the probative value of the conviction supported by the specific facts and circumstances substantially outweighs its prejudicial effect." Miss. R. Evid. 609(b). Here, the circuit judge made such a determination, after the State proffered an "interes[t] of justice" exception based upon the premise that the original trial date was November 2000, and would have remained so but for Strickland's flight.[25] *See **Brengettcy v. State***, 794 So. 2d 987, 993 (Miss. 2001)

_____

[25]Applying the "interes[t] of justice" exception, Strickland's prior conviction in CC-90-003838-00 also would not be time-barred under Mississippi Rule of Evidence 609(b).

19

(by analogy, within the context of constitutional speedy-trial claims "[d]elays which are attributable to one party count against that party."); *Jenkins v. State*, 607 So. 2d 1137, 1138 (Miss. 1992) (within the context of constitutional speedy trial claims, delays "attributable to the defendant tol[l] the running of time."). While Strickland's conviction occurred more than ten years before trial, the "interes[t] of justice" exception was available as a result of Strickland's flight.

¶21. After reviewing the trial court's *Peterson* analysis, this Court finds no abuse of discretion in admitting Strickland's conviction in CC-92-003257-00 pursuant to Mississippi Rule of Evidence 609(a)(1). The circuit court properly made on-the-record findings that all of the *Peterson* factors weighed in favor of admissibility and that the probative value outweighed any prejudicial effect. *See* Miss. R. Evid. 609(a) cmt. Therefore, this Court finds that this issue is without merit.

**III.    Whether Instruction D-2 was properly refused by the circuit court.**

¶22. Instruction D-2, proposed by Strickland, stated:

> [t]he Court instructs the jury that if you find from the evidence beyond a reasonable doubt, that [Strickland] did not commit the crime of armed robbery on May 10, 2000 at the Penny Ridge Grocery, but instead you find beyond a reasonable doubt that he did feloniously take the personal property of [Wright], to wit *her purse*, in her presence and off her person and against her will, by violence to her person or by putting her in fear of some immediate injury to her person, you shall find him guilty of the lesser included offense of robbery.

(Emphasis added). The State objected to this instruction, stating "I don't believe there's any basis in the evidence. The undisputed testimony is that there was a gun that was used, and that there was property that was taken after the display of that weapon." Moreover, the State

noted that Strickland "is not charged in this indictment with taking [Wright's] purse. The robbery of the purse as I see it as set forth in this instruction is not necessarily a lesser included offense. It is a separate crime. He's charged in the indictment from taking a cash register containing money and beer." Strickland maintained that "he did take the purse admittedly and leave with it. . . . Therefore, that is a strong armed robbery. He had no weapon and he never made any threats by her own testimony. He just took her purse and ran with it. Now, it's going to be a jury question as to whether or not he was actually involved in the armed robbery or not." The circuit court refused Instruction D-2, finding that "[t]here is no evidence in the record that will justify the granting of a lesser included offense[,]" and stating that "[b]y [Strickland's] own testimony, he stated that he told [Burnett] to just take it with you. That statement came after the display of the firearm. If a defendant participated in any regard even in the asp[o]r[t]ation of the property . . . it would be armed robbery and cannot be robbery."

¶23. Strickland now asserts that:

> the lower court denied [his] instruction that represented a major part of his defense, a defense that consisted of his involvement in the alleged armed robbery was at wors[t] robbery when he took Wright's purse from the scene and that he had no direct involvement in the actions of Burnett who committed the armed robbery without Strickland's help or consent.

Strickland argues that denial of the lesser-included offense instruction constituted reversible error because he "was not acting in common purpose with Burnett in the armed robbery[.]" The State responds that:

> [t]aken in the light most favorable to the defense, the evidence shows that a deadly weapon was displayed and that [Strickland] participated in the robbery. As the trial court observed, Strickland's participation in the crime made him

21

a principal, regardless of his protestation that he did not know the armed robbery was to occur. . . .  Accordingly, the lesser-included instruction was properly refused.

¶24.   The standard of review for the grant or denial of jury instructions has been set forth by this Court, as follows:

> [j]ury instructions are to be read together and taken as a whole with no one instruction taken out of context.  A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that *the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence*.

*Chandler v. State*, 946 So. 2d 355, 360 (Miss. 2006) (quoting *Ladnier v. State*, 878 So. 2d 926, 931 (Miss. 2004)) (emphasis added).  Regarding lesser-included offense instructions, this Court has stated that they:

> *should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense*.  *Welch v. State*, 566 So. 2d 680, 684 (Miss. 1990). In reviewing the propriety of such an instruction, we have stated:

>> A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser-included offense (conversely, not guilty of at least one element of the principal charge).

> *McGowan v. State*, 541 So. 2d 1027, 1028 (Miss. 1989).  However, this Court has repeatedly held that a lesser-included offense instruction should not be indiscriminately granted, but rather *should be submitted to the jury only where there is an evidentiary basis in the record*.  *Lee v. State*, 469 So. 2d 1225, 1230 (Miss. 1985).

*Chandler*, 946 So. 2d at 360-61 (quoting *Sanders v. State*, 781 So. 2d 114, 119 (Miss. 2001)) (emphasis added). "A defendant is entitled to present their theory of the case to the jury as long as there is some evidentiary basis, even if the evidence is insufficient or of doubtful credibility, 'and even though the sole testimony in support of the defense is the defendant's own testimony.'" *Craig v. State*, 660 So. 2d 1298, 1301 (Miss. 1995) (quoting *Welch*, 566 So. 2d at 684). However, a lesser-included offense instruction may not "be based purely on speculation or surmise." *Wilson v. State*, 639 So. 2d 1326, 1329 (Miss. 1994).

¶25.    "Participation in an armed robbery is sufficient to make one a principal in the crime regardless of whether that participant was the person holding the weapon." *Harrington v. State*, 859 So. 2d 1054, 1057 (Miss. Ct. App. 2003) (citing *Moore v. State*, 493 So. 2d 1295-98 (Miss. 1986)). *See also* *Smothers v. State*, 761 So. 2d 887, 890 (Miss. Ct. App. 2000). As the circuit court found, Strickland admitted to instructing Burnett to take the cash box portion of the cash register after the pistol was threateningly displayed toward Wright. Such participation rendered Strickland a principal in the armed robbery. *See* *Harrington*, 859 So. 2d at 1057. As Strickland admitted to this involvement, there is no "evidentiary basis in the record[,]" *Chandler*, 946 So. 2d at 360-61 (quoting *Sanders*, 781 So. 2d at 119), for the lesser-included offense instruction.[26] Given the absence of a "foundation in the evidence" for the lesser-included instruction, *Chandler*, 946 So. 2d at 360, this Court concludes that the circuit court did not err in denying it. As such, this Court finds that this issue is without merit.

_____

[26]This Court also notes that the indictment does not charge Strickland with the robbery of Wright's purse.

CONCLUSION

¶26.    Based upon the aforementioned analysis, this Court affirms the final judgment and sentence of the Circuit Court of Lowndes County as to Strickland.

¶27.    **CONVICTION OF ARMED ROBBERY AS A HABITUAL OFFENDER AND SENTENCE OF THIRTY (30) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. THIS SENTENCE SHALL NOT BE REDUCED OR SUSPENDED, NOR SHALL THE APPELLANT BE ELIGIBLE FOR PAROLE OR PROBATION.**

**SMITH, C.J., WALLER, P.J., EASLEY, CARLSON, DICKINSON AND LAMAR, JJ., CONCUR. DIAZ, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES. J.**

**DIAZ, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶28.    While I agree that the trial court did not commit reversible error in allowing Strickland's prior conviction to be admitted for impeachment purposes or in refusing his lesser-included-offense instruction, I reject the majority's finding that the defendant did not establish a prima facie case of racial discrimination.  The majority clearly errs by not remanding this case for a ***Batson*** hearing.

¶29.    In order to make a prima facie case of discrimination in the selection of a petit jury, "a white defendant must show . . . that the circumstances give rise to the inference that the prosecutor used the peremptory challenges in order to strike minorities." ***Bush v. State***, 585 So. 2d 1262, 1267-68 (Miss. 1991); *see* ***Puckett v. State***, 788 So. 2d 752, 757 (Miss. 2001) (acknowledging that the holding in ***Powers v. Ohio***, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), eliminated the first two ***Batson*** factors).  Thus, "the pivotal question is whether the opponent of the strike has met the burden of showing that [the] proponent has

24

engaged in a pattern of strikes based on race or gender, or in other words 'the totality of the relevant facts gives rise to an inference of discriminatory purpose.'" *Randall v. State*, 716 So. 2d 584, 587 (Miss. 1998) (quoting *Batson v. Kentucky*, 476 U.S. 79, 94, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986)).

¶30.   Strickland established a prima facie case of purposeful racial discrimination in the State's exercise of its peremptory challenges and was thus entitled to a *Batson* hearing.  He established his prima facie case by showing that the State used seven of its eleven peremptory challenges, or 63.6%, against African-Americans.[27]  Striking seven African-Americans, as opposed to only four whites, constitutes "a pattern of strikes based on race"[28] and "gives rise to an inference of discriminatory purpose."  *See Chisolm v. State*, 529 So. 2d 630, 632 (Miss. 1988); *Thorson v. State*, 653 So. 2d 876, 895-96 (Miss. 1994).

¶31.   In *Chisolm* this Court held that the defendant had made a prima facie case based on the State's use of seven of its twelve peremptory challenges against African-Americans. *Id.* at 632.  Indeed, the Court found the point virtually inarguable: "*Quite apparently*, [the defendant] made a prima facie showing meeting the *Batson* criteria." *Id.* (emphasis added). The majority attempts to distinguish *Chisolm* from the present case on the ground that "the

---

[27]The majority inexplicably claims that Strickland offered no evidence to the trial court of a *Batson* violation.  The number of strikes exercised by the State against African-American venirepersons certainly constitutes evidence of discrimination.

[28]The majority apparently does not regard the use of seven out of eleven challenges against African-Americans as a "pattern."  Otherwise, its determination that the State's use of peremptory challenges in this case, "standing alone," is insufficient to establish a prima facie case conflicts with *Batson*.  In *Batson* the Supreme Court made clear that a pattern of strikes can be sufficient by itself to establish a prima facie case: "[A] 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

25

appellate record [in *Chisolm*] included the number of African-Americans on the empaneled jury." This attempt fails for two reasons.

¶32.   First, this Court has never required a party making a *Batson* challenge to note the racial composition of the jury or the venire in order to establish a prima facie case. Although the racial composition of the jury is relevant to a determination of whether the moving party has made a prima facie case of discrimination, it is not an essential part of a *Batson* challenge:

> The *Batson* doctrine is not concerned with racial, gender, or ethnic *balance* on petit juries, and it does not hold that a party is *entitled* to a jury composed of or including members of cognizable [sic] group.  Rather, it is concerned exclusively with *discriminatory intent* on the part of the lawyer against whose use of his peremptory strikes the objection is interposed.

*Ryals v. State*, 794 So. 2d 161, 164 (Miss. 2001) (emphasis in original) (citations omitted). Accordingly, the fact that Strickland's attorney failed to note the racial composition of the jury for the record does not make the present case materially different from *Chisolm* and should not be held to preclude Strickland from establishing a prima facie case of discrimination.

¶33.   Second, although the record in *Chisolm* reflected that the jury was composed of three African-Americans and ten whites, the record did not indicate what the racial composition of the venire was.  The racial composition of the jury, alone, is meaningless if the racial composition of the venire is not known.  As the majority recognizes, unless the racial composition of the venire is known, there is no way of determining whether the number of strikes exercised against African-Americans was disproportionate to the number of African-Americans in the venire or whether the percentage of African-Americans who sat on the jury

26

was significantly lower than the percentage in the venire. Therefore, **Chisolm** is not distinguishable from the present case because the only statistic probative of discrimination before the Court in **Chisolm** was the number of strikes (seven) used against African-Americans.

¶34.   In **Thorson** this Court held that the defendant should have been granted a **Batson** hearing because the State exercised seven peremptory challenges against African-Americans. **Id.**, 653 So. 2d at 896. The majority argues that **Thorson** is distinguishable because "the appellate record [in **Thorson**] included the number of African-Americans on the venire." As stated above, this Court has never made providing the racial composition of the venire a prerequisite to the establishment of a prima facie **Batson** claim. Thus, the absence from the record of any indication of the racial composition of the venire does not distinguish this case from **Thorson**. Moreover, even though the record does not reflect how many African-Americans were included on the venire, the percentage of the population of the county from which the venire was drawn that is African-American is known and can serve as a reliable estimate of the number of African-Americans in the venire. *See* **Walker v. State**, 740 So. 2d 873, 880 (Miss. 1999); **U.S. v. Alvarado**, 923 F.2d 253, 255-56 (2nd Cir. 1991) ("We are not informed of the minority percentage of the venire in this case, but we may accept as a surrogate for that figure the minority percentage of the population of the Eastern District, from which the venire was drawn.").

¶35.   In **Walker**, although the racial composition of the venire was not known, this Court took judicial notice of the fact that the county from which the venire was drawn was 50% African-American and used that as an indication of the percentage of African-Americans in

the venire. *Id.* at 880. In light of the fact that around half of the venire was composed of African-Americans, this Court held that the State's use of seven of nine peremptory strikes against African-Americans and the seating of only two African-Americans on the jury gave rise to an inference of discrimination. *Id.* In the present case, the venire was drawn from Lowndes County. According to the 2000 U.S. Census, Lowndes County is 41.9% African-American. The State's challenge rate against African-Americans was 63.6% (seven of eleven). Thus, the challenge rate was almost 22% higher than the likely percentage of the venire composed of African-Americans. Such a significant statistical disparity gives rise to an inference of discrimination and strongly supports a prima facie case under *Batson*.[29] Accordingly, the trial court's finding that Strickland did not make a prima facie case was clearly erroneous and must be reversed. *Lockett v. State*, 517 So. 2d 1346, 1349 (Miss. 1987).

¶36. The majority concludes "that exercising seven [of eleven] peremptory strikes against African-Americans, standing alone, . . . fails to establish" a prima facie case.[30] The only case

_____

[29] Other courts have held that parties have made out prima facie cases when comparable statistical disparities were involved. *Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677 (9th Cir. 1999) (56% challenge rate against African-Americans in district with 30% African-American population); *Alvarado*, 923 F.2d at 256 (57% challenge rate against minorities in district with 29% minority population). Furthermore, other courts have held that challenge rates against minorities comparable to the one in this case (seven of eleven) raise an inference of discrimination. *Harrison v. Ryan*, 909 F.2d 84, 87 (3rd Cir. 1990) (six of eight); *People v. Jenkins*, 554 N.E.2d 47, 50 (N.Y. 1990) (seven of ten); *Lewis v. State*, 775 S.W.2d 13, 15 (Tex. Ct. App. 1989) (seven of ten); *People v. White*, 669 N.Y.S.2d 503, 504-05 (N.Y. Sup. Ct. 1998) (seven of eleven).

[30]The majority cites *Flowers v. State*, 947 So. 2d 910 (Miss. 2007), as authority for this conclusion. However, in *Flowers* this Court was not confronted with the question of whether the defendant established a prima facie case, but whether the trial court erred in

the majority cites that supports its conclusion is *Ryals v. State*, 794 So. 2d 161 (Miss. 2001). I believe *Ryals* was wrongly decided insofar as it impliedly overruled *Chisolm* and *Thorson* by holding that the State's use of ten out of twelve strikes against women did not give rise to an inference of discrimination. *Id.* at 166. Using ten out of twelve strikes against a cognizable group constitutes a pattern that should allow any party under any circumstances to establish a prima facie case of discrimination under *Batson*. Therefore, in my view, *Ryals* should not guide the Court's decision in the present case and should be partly overruled.

¶37. Making out a prima facie case of purposeful discrimination should not be very difficult for any party. The United States Supreme Court has recently stated that the burden of establishing a prima facie case under *Batson* is not "onerous." *Johnson v. California*, 545 U.S. 162, 170, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). One court has described the burden of establishing a prima facie case of discrimination as "minimal." *Overton v. Newton*, 295 F.3d 270, 279 n.10 (2nd Cir. 2002). I believe that this Court has established too high a threshold for parties to make a prima facie showing under *Batson*. We have increased the burden of establishing a prima facie case to the point where that burden is "onerous" in certain circumstances.[31]

---

denying the defendant's *Batson* claim. *See id.* at 917-18. The "analysis" in which this Court was engaged was not an analysis of whether the defendant made a prima facie case, but whether he satisfied the third prong of *Batson*. Thus, *Flowers* provides no support for the majority's position.

[31]The holding in this case will also, I fear, tie the hands of trial judges, in that they will now not be able to infer discrimination and grant a *Batson* hearing based solely on the proponent's use of seven out of eleven challenges (or a comparable percentage) against a protected group.

29

¶38. In many circumstances it is virtually impossible to produce evidence of purposeful discrimination other than the number of strikes exercised against a protected group. *See **U.S. v. Casper***, 956 F.2d 416, 419 (3rd Cir. 1992) ("There will seldom be much direct evidence of discriminatory intent."); ***Bogan v. State***, 811 So. 2d 286, 288 (Miss. Ct. App. 2001) ("Discrimination is seldom expressed in direct terms. It is instead generally expressed insidiously."). Sometimes the proponent of a peremptory challenge is able to discriminate against a racial group without providing a basis for inferring discrimination other than the fact that several members of that group were excluded from the jury. As the Supreme Court observed in ***Batson***, "[P]eremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate." ***Batson***, 476 U.S. at 96, 106 S.Ct. at 1723 (internal quotation marks and citation omitted). If parties bringing ***Batson*** claims cannot rely on the fact that a clear majority of the proponent's challenges were used against a protected group in order to establish a prima facie case, then many parties will be denied a ***Batson*** hearing, and many discriminatory challenges will never be exposed.[32]

¶39. The majority's holding not only inadequately safeguards a defendant's right to be tried by a jury selected without any discrimination involved, but also infringes the right of venirepersons under the Equal Protection Clause to not be excluded from jury service

---

[32]The majority's assertion that I advocate that this Court "rule in a factual vacuum" and not require parties to "provide facts and circumstances to support [their] argument" of a ***Batson*** violation is absurd. Of course parties have to bring forward some evidence of discrimination in order to establish a prima facie case. No party should be granted a ***Batson*** hearing unless he or she points to something that would suggest that peremptory strikes were used to purposefully discriminate against a protected group. I simply disagree with the majority that the evidence offered by Strickland in support of his ***Batson*** motion was insufficient to establish a prima facie case of discrimination.

because of their race. ***Batson***, 476 U.S. at 87, 106 S.Ct. at 1718 (citations omitted) ("[B]y denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror."). Morever, the negative impact of today's holding will be felt by the public as well: "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude . . . persons [on account of their race] from juries undermine public confidence in the fairness of our system of justice." ***Id.*** (citations omitted).

¶40.    I would hold that the trial court's determination that Strickland did not make a prima facie case of purposeful discrimination was clearly erroneous and would remand this case for a ***Batson*** hearing. Therefore, I respectfully concur in part and dissent in part.

**GRAVES, J., JOINS THIS OPINION.**